In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-1411

ANTCHINECHE TSEGAW AYELE,

*Petitioner,*

*v.*

ERIC H. HOLDER, JR., Attorney General
of the United States,[1]

*Respondent.*

Petition for Review of an Order
of the Board of Immigration Appeals.
No. A76-853-631

ARGUED OCTOBER 27, 2008—DECIDED MAY 4, 2009

Before KANNE, WILLIAMS, and SYKES, *Circuit Judges*.

WILLIAMS, *Circuit Judge.* Antchineche Tsegaw Ayele
seeks review of a final order of the Board of Immigration
Appeals ("BIA"). The BIA summarily upheld the denial of

[1] We substitute Eric H. Holder, Jr., the current Attorney
General of the United States, as the Respondent in this action.
*See* Fed. R. App. P. 43(c)(2).

Ayele's application for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). The BIA affirmed the finding of the Immigration Judge ("IJ") that although Ayele was credible and her subjective fear of future persecution was reasonable, she failed to prove her fear was objectively reasonable. We believe the IJ did not fully analyze Ayele's family ties claim because he failed to address whether her family constituted a social group, did not discuss the treatment of her mother and uncles, and relied on Country Reports to deny her claim despite finding Ayele and her witness credible. Because of these deficiencies, we grant her petition for review, vacate the BIA's order and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

Asylum applicant Antchineche Tsegaw Ayele is an ethnic Amhara born in Addis Ababa, Ethiopia on March 26, 1975. The Amhara tribe has been associated with the Mengistu regime which ruled the country before its overthrow by the Ethiopian Peoples' Revolutionary Democratic Front ("EPRDF") in May 1991. Mengistu Haile Mariam led the former military government, which has been accused of property confiscation and the killing of thousands of opponents since the regime came into power in 1974. When EPRDF forces invaded Addis Ababa in 1991, members of the Mengistu regime and their families fled into exile. Many were captured by EPRDF forces and detained, and many former officials

were charged with war crimes committed against civilians during the Mengistu administration.

Ayele, her mother, Yeshibrget Belihu, and her two sisters were among those who fled Ethiopia before the EPRDF's imminent invasion. Belihu and Ayele's father, Tsegaw Ayele ("Mr. Ayele"), were members of the Workers' Party of Ethiopia ("WPE"), which was Mengistu's political party. Mr. Ayele also had served as the President of the National Olympic Committee and Senior Vice President of the Association of African National Olympic Committee, as well as Minister of Regional Affairs during the Mengistu regime since 1986. Although Mr. Ayele did not want the minister role with the government (in fact, he cried when he learned of his appointment), President Mengistu appointed Mr. Ayele and he believed that if he refused it, he or his family may have faced punishment.[2]

One April night in 1991, when Ayele was 15, her parents told her and her younger sisters to pack their things because they were leaving the country before the rebels invaded the capital. As she, her mother and sisters prepared to depart on a morning flight to Kenya, her father told them he would join them later, but he never did.

Ayele, her mother and her sisters arrived in Kenya to a very different lifestyle. Because of Mr. Ayele's prominent position in the Mengistu government, the family had lived a privileged life in Ethiopia. They lived in a villa, had maids and a chauffeur, traveled frequently, and the girls

---

[2] Before his appointment as sports commissioner, Mr. Ayele had been secretary of the YMCA in Ethiopia.

attended private schools. In Kenya, Ayele and her sisters and mother lived on money sent by a family friend in Europe. Belihu kept the girls secluded and told them to never disclose to anyone who their parents were. During their time in Kenya, Ayele claimed that they were mistreated by Ethiopian infiltrators, and her mother was asked to show her passport everywhere she went. In 1992, Ayele left Kenya and headed to the United States. Sometime after she left, Ayele learned that her mother had been arrested in 1995 by Kenyan officers, who Ayele alleges were bribed by Ethiopian infiltrators that targeted individuals who had been involved in the Mengistu regime. Ayele's mother eventually was released, and her mom and sisters went to London.

Ayele arrived in the United States in September 1992 on an F-1 visa, which allowed her to attend Defiance College, where she eventually earned a bachelor's degree in biology. While working part-time on an H-1B visa, Ayele attended Ball State University, where she received dual biology and physiology master's degrees. In 1998, Ayele filed an asylum and withholding of removal petition, which was denied, but her F-1 status was eventually reinstated. Ayele fell out of status when she stopped working in December 2002. Despite attempts to find employment as an H-1B visa holder, Ayele did not find a job or an employer who would petition for her permanent residency based on employment. In March 2003, Ayele renewed her application for asylum, withholding of removal, and protection under the CAT.

Meanwhile, Ayele's mother, Belihu, gained permanent status in the United Kingdom ("U.K.") in 2003.[3] While in Kenya, Belihu had become a member of the All Amhara People's Organization ("AAPO"), a political group opposed to the EPRDF-led government. In Kenya, Belihu was discreet about her activities with the group, but when she moved to the U.K., she became more openly involved and serves as treasurer and a member of the executive committee of a U.K. AAPO branch. In 1997, Ayele joined a Washington, D.C. branch of the AAPO, called the All Amhara People's Relief and Development Association. Ayele provides financial support to the group and writes letters on behalf of the group to embassy officials and United States senators.

Although Ayele, and eventually her mother and sisters, adjusted to life in their new countries, other members of Ayele's family were not so fortunate. When they were living in Kenya, Ayele and her mother and sisters learned from an aunt that after they had fled their home, the EPRDF targeted Ayele's father and confiscated Mr. Ayele's guns and arrested him. Mr. Ayele was imprisoned from June 1991 to August or September 1993, during which time he was interrogated and tortured. Eventually Mr. Ayele was released on bail, according to Ayele, due to pressure from international contacts he made while working with the African National Olympic Committee and Red Cross. Mr. Ayele was never formally

[3] Ayele cannot live in the U.K. with her mother and sisters because when her mother entered England in 1995, she failed to report Ayele as her daughter.

charged with any criminal offenses. Since his release from prison, he remains under government surveillance, he cannot leave the country, and he has been unable to obtain a job, despite his efforts to find employment. His extended family pays his living expenses.

Ayele's uncle, Dr. Negussie Tegegne, who testified on Ayele's behalf at her removal hearing, faced a fate similar to Ayele's father.[4] Dr. Tegegne served as a physician at a government hospital during the Mengistu administration. While living in Ethiopia after the fall of the Mengistu regime, Dr. Tegegne was denied employment as a physician and was imprisoned because of his AAPO membership and his activism in providing medical care to refugees in Addis Ababa. In September 1994, while attending the trial of Professor Asrat Woldeyes,[5] Dr. Tegegne and other AAPO attendees were arrested. Dr. Tegegne was incarcerated for a month and endured torture and interrogations. He was arrested again in December 1995. The next year, Dr. Tegegne escaped Ethiopia and was granted asylum in the United States.

Dr. Tegegne was not the only other family member harmed by the Ethiopian government. Dr. Tegegne testified that Ayele's other uncle, Yigremachew Belihu, who is the biological brother of Ayele's mother, disappeared in

---

[4] Dr. Tegegne is the stepbrother of Ayele's mother.

[5] Professor Asrat Woldeyes served as the president of the AAPO and called for a nonviolent, united Ethiopia. He was arrested and convicted of sedition.

October 1997, never to be heard from again.[6] Dr. Tegegne also testified that his brother, a school principal, was killed by Oromo nationalists because the EPRDF-led government instigated animosity against ethnic Amharas, and another of Dr. Tegegne's friends was killed after the government accused him of being part of a rebel group.

After reviewing documentary evidence and hearing testimony from Ayele and Dr. Tegegne during a removal hearing held on August 6, 2003, the IJ denied Ayele's renewed asylum, withholding of removal and CAT application in a decision dated June 29, 2006. The IJ found both Ayele and her uncle to be credible, but determined that Ayele did not sufficiently demonstrate that her fear of future persecution was objectively reasonable given the current country conditions. On January 23, 2008, the BIA affirmed, without opinion, the IJ's decision and allowed Ayele to voluntarily depart the United States. Ayele petitions for review of the BIA decision ordering her removal.[7]

---

[6] Ayele explained in an affidavit attached to her asylum application that witnesses related that Mr. Belihu was abducted by the EPRDF regime's secret police. The family presumes he is dead.

[7] The IJ found that although Ayele filed her asylum application past the one-year deadline from the date of her entry into the United States, she was not barred from filing for asylum because her circumstances fell within the "extraordinary circumstances" exception pursuant to 8 C.F.R. § 1208.4(a)(5). The IJ also found that Ayele's temporary stay in Kenya did not constitute "firm resettlement" under 8 C.F.R. § 208.15, and thus

(continued...)

## II.  ANALYSIS

We review directly the IJ's decision where, as here, the BIA summarily affirms the decision of the IJ without opinion. *Balliu v. Gonzales*, 467 F.3d 609, 612 (7th Cir. 2006). Our review is one of deference. *Musollari v. Mukasey*, 545 F.3d 505, 508 (7th Cir. 2008). We review to see if the "determination was supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Ogayonne v. Mukasey*, 530 F.3d 514, 519 (7th Cir. 2008) (internal citation and quotation marks omitted). To reverse a BIA decision, the petitioner must show that the evidence compels, not merely supports, a different result. *Id.*

### A.  Asylum claim

The Immigration and Nationality Act ("INA") defines a "refugee" as someone who is unable or unwilling to return to her homeland "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *See* 8 U.S.C. § 1101(a)(42)(A); *see also Musollari*, 545 F.3d at 508 ("The Attorney General has discretion to grant asylum to an alien 'refugee.'"). Refugee status can be proven through past persecution or fear of future persecution. *Id.* An applicant who demonstrates past persecution is entitled to a rebuttable presump-

---

[7] (...continued)
she was not barred from seeking asylum in the United States.

tion of future persecution. *Ingmantoro v. Mukasey*, 550 F.3d 646, 649 (7th Cir. 2008). Without evidence of past persecution, an applicant must demonstrate a well-founded fear of future persecution. *Id.* at 650-51. The applicant must satisfy both the objective and subjective prongs of the well-founded fear standard. *Id.* at 651.

Ayele admits that the government never personally persecuted her, so to succeed on her asylum petition she must show a well-founded fear of future persecution. Based on Ayele's credible testimony, the IJ found that Ayele established a subjective fear of future persecution. Thus, only the objective component remains at issue. *See Bolante v. Mukasey*, 539 F.3d 790, 794 (7th Cir. 2008) (reviewing court should not ordinarily disturb credibility finding). While the subjective component often depends upon the applicant's own credibility and testimony, the objective prong requires evidence that there is a reasonable probability that the applicant "will be singled out individually for persecution" or that "there is a pattern or practice of persecution of an identifiable group, to which the [applicant] demonstrates he belongs, such that the [applicant's] fear is reasonable." *Capric v. Ashcroft*, 355 F.3d 1075, 1085 (7th Cir. 2004) (internal citations omitted). To be objectively reasonable, an applicant must show only that persecution is a "reasonable possibility," not that persecution is definite or even likely. *See Ahmed v. Ashcroft*, 348 F.3d 611, 618 (7th Cir. 2003); *see also Kllokoqi v. Gonzales*, 439 F.3d 336, 345 (7th Cir. 2005) ("The applicant may establish a reasonable possibility of future persecution by showing that there is even a 10 percent chance that he will be shot, tortured, or otherwise persecuted."). An

asylum applicant must show a nexus between her fear of future persecution and one of the five protected grounds: race, religion, nationality, membership in a particular social group, or political opinion. *Torres v. Mukasey*, 551 F.3d 616, 629 (7th Cir. 2008); *see also* 8 U.S.C. § 1101(a)(42)(A).

Ayele presents three grounds for her asylum claim: (1) her Amhara ethnicity; (2) her involvement in the AAPO political organization; and (3) her family as a social group. First, she contends that because she is an ethnic Amhara, she fears future persecution because of the current government's disdain for Amhara people. The IJ denied Ayele's ethnicity claim based on State Department Country Reports demonstrating that ethnic Amharas currently thrive in Ethiopia and specifically pointed to a 1997 Country Report indicating that Amharas serve in the executive cabinet of the current government. Ayele argues that although members of the current administration have Amharic names, they are not ethnic Amharas. During the removal proceedings, Ayele's uncle, Dr. Tegegne explained that ethnic Amharas are easily identified based on their accent. Second, Ayele maintains that she fears persecution based on her political opinion because if she returned to Ethiopia she would continue her involvement with the AAPO and would not remain silent. In his decision, the IJ pointed to Country Reports indicating that AAPO members are not being targeted by the EPRDF-led government.

We cannot say that the record compels the conclusion that Ayele's fear of future persecution on the account of

her ethnicity or political opinion is objectively reasonable. The IJ pointed to case law and Country Reports explaining why he believed Ayele's fear of future persecution based on her ethnicity and political opinion was unfounded. He explained that Amharas serve in government positions and that as long as political opposition groups denounce violence, the government will not harm them. He further concluded that Ayele had not proven she will be singled out from other Amharas and AAPO members. *See Chatta v. Mukasey*, 523 F.3d 748, 752 (7th Cir. 2008). The IJ provided reasoned analysis that is supported by substantial evidence. *See Medhin v. Ashcroft*, 350 F.3d 685, 690-91 (7th Cir. 2003). Therefore, we cannot reverse the BIA's decision on these grounds.

Ayele's argument that she may face persecution if she returns to Ethiopia because of her family ties fares better than her other two grounds. Ayele made it apparent in her asylum application and in her attorney's closing argument before the IJ that she feared persecution on account of the treatment of her family and her family's prominent position in the Mengistu regime.

Nonetheless the IJ failed to fully analyze Ayele's claim that she may face persecution on account of her familial ties. Even the government concedes that the IJ wholly failed to discuss whether a family can constitute a social group. The only reference to Ayele's family in the IJ's analysis was the following:

> In addition, if the . . . government desired to target the respondent because she is the daughter of a former minister in the Mengistu regime, or because

> she is Amhara, it would stand to reason that the government would also seek to persecute the respondent's father. However, based on the respondent's own testimony, since her father's release in 1993, he has not been physically harmed, rather, only placed under surveillance. Thus, the fact that the respondent's father has been living in Ethiopia relatively unharmed for over a decade after her departure significantly diminishes her claim of future persecution.

This cursory explanation causes us to question whether the IJ fully considered Ayele's familial ties claim. *See Chitay-Pirir v. INS*, 169 F.3d 1079, 1081 (7th Cir. 1999) (remand required because unclear whether claim fully understood or analyzed). Indeed, it seems that the IJ was merely using the treatment of Ayele's father to show that she would not be singled out because of her ethnicity or political opinion, rather than as an analysis of whether Ayele would face persecution based on her family's history. There is no reference in the IJ's opinion to Ayele's fears that she will be specifically targeted because her mother, a political activist, lives abroad and outside of the EPRDF-led government's reach. Moreover, despite finding Ayele and her uncle credible, the IJ failed to discuss the past treatment of Ayele's two uncles. *See Sosnovskaia v. Gonzales*, 421 F.3d 589, 593-94 (7th Cir. 2005) (determining that the IJ erroneously failed to discuss arguments and evidence presented).

Our circuit recognizes a family as a cognizable social group under the INA, *see Torres*, 551 F.3d at 629 (citing *Iliev*

*v. INS*, 127 F.3d 638, 642 (7th Cir. 1997)), as do our sister circuits. *See, e.g., Lopez-Soto v. Ashcroft*, 383 F.3d 228, 235 (4th Cir. 2004); *Jie Lin v. Ashcroft*, 377 F.3d 1014, 1028 (9th Cir. 2004); *Gebremichael v. INS*, 10 F.3d 28, 36 (1st Cir. 1993) ("There can, in fact, be no plainer example of a social group based on common, identifiable and immutable characteristics than that of the nuclear family."). Without even a mention of this principle in the IJ's opinion, we cannot know for certain that he assessed this ground for Ayele's asylum request. *See Chitay-Pirir*, 169 F.3d at 1081.

Every member of Ayele's immediate family either is in exile, has disappeared, has been imprisoned and tortured, or is under house arrest.[8] Her father was a prominent member of the Mengistu regime, and her mother is an AAPO activist. During her removal proceedings, Ayele's uncle testified that her family name was recognizable and that people would realize her father was a minister in the Mengistu administration. Her mother, and her uncle who was imprisoned and tortured based on his political activism, are outside of the reach of the government, making Ayele particularly vulnerable. *See Mema v. Gonzales*, 474 F.3d 412, 417 (7th

---

[8] The government asserts that Ayele has a large family living in Ethiopia unharmed, which, it argues, belies Ayele's contention that she will be targeted because of her family ties. The record shows that only Mr. Ayele's stepmother and unknown members of Belihu's family remain in Ethiopia. In her reply brief, Ayele explains she only knows for certain that Mr. Ayele's stepmother remains in Ethiopia.

Cir. 2007) ("Oft times persecutors target children of political dissidents not because they have imputed the parents' political opinion to the children, but as a means of harassing, intimidating, and influencing the behavior of the parent."). The IJ failed to discuss any of this evidence in light of Ayele's claim.

As noted earlier, an asylum applicant can establish a well-founded fear of persecution by proving either a pattern or practice of persecution of a social group, of which the applicant has proven she is a member, or by proving the applicant will be singled out personally. 8 C.F.R. § 1208.13(b)(2)(iii). The regulation states:

> In evaluating whether the applicant has sustained the burden of proving that he or she has a well-founded fear of persecution, the asylum officer or immigration judge shall not require the applicant to provide evidence that there is a reasonable possibility he or she would be singled out individually for persecution if:
>
> > (A) The applicant establishes that there is a pattern or practice in his or her country . . . of persecution of a group of persons similarly situated to the applicant on account of race, religion, nationality, membership in a particular social group, or political opinion; and
> >
> > (B) The applicant establishes his or her own inclusion in, and identification with, such group of persons such that his or her fear of persecution upon return is reasonable.

8 C.F.R. § 1208.13(b)(2)(iii). Although it is not entirely clear that the IJ even considered Ayele's social group claim, if he did, it seems he did precisely what this regulation instructs an IJ not to do. *See Banks v. Gonzales*, 453 F.3d 449, 452 (7th Cir. 2006). That is, the IJ required Ayele to prove that she would be singled out individually without deciding whether Ayele proved a pattern or practice of persecution of her social group.[9]

Another problem with the IJ's assessment is that despite crediting Ayele and her uncle's testimony, he characterized Ayele's father as "relatively unharmed." The IJ explained that Mr. Ayele had not been physically harmed since his release from prison, but was placed merely under surveillance. This reasoning is problematic because it fails to recognize that surveillance has been recognized as a possible form of persecution in this circuit, *see, e.g.*, *Diallo v. Ashcroft*, 381 F.3d 687, 697 (7th Cir. 2004), and that this circuit has never required physical harm to demonstrate persecution, *see Begzatowski v. INS*, 278 F.3d 665, 670 (7th Cir. 2002) (rejecting BIA's attempt "to impose on asylum applicants the additional burden of establishing permanent or serious injuries as a result of their persecution"). Moreover, the IJ ignored evidence

---

[9] The government's contention that Ayele did not fully exhaust her claim that her family suffered a pattern or practice of persecution is not persuasive. Throughout her asylum application and in her appeal to the BIA, Ayele repeatedly discusses the treatment of her family members in the past and her fear that she may face persecution because of her family's history.

that Mr. Ayele was unable to work because of his former affiliation with the Mengistu regime, *see Borca v. INS*, 77 F.3d 210, 216 (7th Cir. 1996) (deliberate imposition of substantial economic disadvantage may amount to persecution), and that he is forbidden from leaving the country. *Cf. Toptchev v. INS*, 295 F.3d 714, 722 (7th Cir. 2002) (determining no possibility of future persecution partly because government had not interfered with applicant leaving country).

Finally, the IJ relied heavily on Country Reports to deny all of Ayele's claims, which in and of itself gives us concern. *See, e.g., Niam v. Ashcroft*, 354 F.3d 652, 658 (7th Cir. 2004) (criticizing immigration court's "chronic overreliance" on Country Reports). To the extent that the IJ relied on the reports to assess Ayele's family claim, this reliance is erroneous because the IJ credited the testimony of Ayele and her uncle, which provides the only foundation for which one could determine that Ayele faced the possibility of persecution because of her family ties. *See Bace v. Ashcroft*, 352 F.3d 1133, 1139 (7th Cir. 2003) ("[I]t would be improper to find that a witness's testimony about specific events could be contradicted by a generalized State Department report broadly discussing conditions in the applicant's country of origin.") (internal quotation marks omitted). Country Reports may inform an IJ in determining the treatment of a particular political organization or ethnic group, but Country Reports will rarely aid the IJ in analyzing the unique position of a family as a social group. *See Galina v. INS*, 213 F.3d 955, 959 (7th Cir. 2000) ("[country] reports are brief and general, and may fail to identify specific, perhaps

local, dangers to particular, perhaps obscure, individuals."). Ayele's credible testimony should have been sufficient evidence to demonstrate the historical treatment of her family and her fear that she would face persecution on account of her family if she returned to Ethiopia. "It is well-established that the credible testimony of an alien, without more, may be sufficient to sustain an asylum claim." *Korniejew v. Ashcroft*, 371 F.3d 377, 382 (7th Cir. 2004); *see also Ikama-Obambi v. Gonzales*, 470 F.3d 720, 725 (7th Cir. 2006).

But in addition to the credible testimony of Ayele and her uncle, the record also contained evidence, including portions of the cited Country Reports, corroborating Ayele's assertions about the current treatment of her father by the government. *See Ghebremedhin v. Ashcroft*, 385 F.3d 1116, 1119 (7th Cir. 2004) (deciding that the history of persecution detailed in the Country Report and the instances of mistreatment identified by the asylum applicant leads to the conclusion that no reasonable factfinder after having credited his testimony could then find no well-founded fear of future persecution). The IJ selectively chose to highlight certain portions of the Country Reports, while ignoring other portions that were favorable to Ayele. For example, when discussing the 2005 Country Report, the IJ mentioned the "credible" elections in Ethiopia in 2005, but ignored information concerning the continued wiretap surveillance of Ethiopian political party leaders by the government.

If Ayele and her uncle's story about the treatment of her family members was credited, and further cor-

roborated by the Country Report, it is not clear why the IJ determined that Ayele does not have an objectively reasonable fear of persecution based on her familial ties. Even more fundamentally, though, the IJ did not specifically address whether Ayele's family is a particular social group. Because of this omission, a remand for the BIA to consider this issue is necessary. *See Gonzales v. Thomas*, 547 U.S. 183, 186-88 (2006) (per curiam) (remand required for BIA to consider whether applicant's family "presents the kind of kinship ties that constitute a particular social group") (internal quotation marks omitted). On remand, the BIA should consider the cumulative effect of all of the hardships and treatment to which Ayele and her family have been subjected. The BIA should consider the former role of Ayele's parents in the Mengistu regime, the past treatment of her parents, and her uncles, and the current treatment of her father. *See Zhang v. Gonzales*, 408 F.3d 1239, 1249 (9th Cir. 2005) (IJ should not evaluate events in isolation, but rather their cumulative impact).

### B.  Withholding of removal and CAT relief

An applicant seeking withholding of removal under the INA must demonstrate a "clear probability" of future persecution based on the "alien's race, religion, nationality, membership in a particular social group or political opinion." 8 U.S.C. § 1231(b)(3)(A); *see Khan v. Filip*, 554 F.3d 681, 690 (7th Cir. 2009). Applicants seeking relief under the CAT must show that it is "more likely than not" that they will be tortured if removed. 8

C.F.R. § 1208.16(c)(2); *see Rapheal v. Mukasey*, 533 F.3d 521, 526-27 (7th Cir. 2008). Both tests apply a more stringent standard than that of the asylum inquiry. *See Selimi v. Ashcroft*, 360 F.3d 736, 741 (7th Cir. 2004).

The IJ denied Ayele's withholding of removal and CAT claims based on his determination that she had not satisfied her burden of establishing that she qualified for asylum. Because we grant her petition to review her asylum denial, we need not reach her withholding of removal or CAT claims. On remand, the BIA should review these claims as it reconsiders the administrative record. *See Gomes v. Gonzales*, 473 F.3d 746, 757 (7th Cir. 2007).

## C. Judicial notice of the 2005 and 2007 Country Reports

Finally, we note that Ayele, in an effort to refute some of the arguments raised by the government in its brief, presented a supplemental appendix with her reply brief and requested we take judicial notice of the exhibits. The supplemental appendix included: (1) a 2005 Country Report; (2) a 2006 Amnesty International report; (3) a 2007 Country Report; and (4) 2008 testimony by an Amnesty International advocacy director. The government moved to strike these materials as extra-record evidence, contending that Ayele could instead move to reopen her case based on changed conditions and that she has waived or not fully exhausted some of her arguments

because she did not raise them in her opening brief.[10] We do not agree, and therefore, we take judicial notice of the Country Reports and include them in the analysis of this case for the reasons explained below.

The IJ cited the 2005 Country Report in his decision, but the 2005 report is not part of the administrative record. Because the IJ relied on the report in its decision, we took judicial notice of the 2005 report. *See Nwaokolo v. INS*, 314 F.3d 303, 308 (7th Cir. 2002) (taking judicial notice of the country reports on current country conditions crucial to the decision). We also took judicial notice of the 2007 Country Report because it provides the most recent evidence of the current country conditions at the time of Ayele's appeal. *See, e.g., Lhanzom v. Gonzales*, 430 F.3d 833, 848 (7th Cir. 2005). Although the 2007 Country Report was not part of the record below, we still may take judicial notice of it. *See Kebe v. Gonzales*, 473 F.3d 855, 857 (7th Cir. 2007) (taking judicial notice of most recent Country Report submitted with appellate brief, although not submitted with applicant's motion to reopen). The 2005 and 2007 Country Reports were relevant to whether

---

[10] Ayele offered the Country Reports as evidence of the human rights abuses that continue to occur in Ethiopia, a position she has maintained since the initial filing of her asylum application, which means the argument is not waived or unexhausted. To the extent that Ayele relies on the Country Reports and the Amnesty International materials to explain the various political opposition groups, we need not consider them because we have affirmed the immigration court's determination of her political claim.

Ayele's fear of future persecution is reasonable based on the current conditions in Ethiopia, which formed the basis of the IJ's decision. *See id.* (directing BIA to consider most recent country report indicating that the EPRDF-led government has become more aggressive in cracking down on opposition protestors since the May 2005 elections). We did not consider the Amnesty International report and testimony because those documents were submitted to us in support of Ayele's political claim, and we found the IJ's analysis of that claim to be supported by substantial evidence so there was no need to consider them.


## III.  CONCLUSION

Therefore, we GRANT Ayele's petition for review, we VACATE the BIA decision, and REMAND to the BIA for further proceedings consistent with this opinion.