In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-4187

TEMESGEN WOLDU HAILE,

*Petitioner*,

*v.*

ERIC H. HOLDER, JR.,
Attorney General of the United States,

*Respondent.*

Petition to Review an Order of the
Board of Immigration Appeals.
No. A079 276 969.

ARGUED NOVEMBER 6, 2009—DECIDED JANUARY 6, 2010

Before POSNER, KANNE, and ROVNER, *Circuit Judges*.

POSNER, *Circuit Judge*. The petitioner was born in Addis Ababa, the capital of Ethiopia, in 1976. His parents were of Eritrean origin, but at the time Eritrea was a part of Ethiopia and both they and he were Ethiopian citizens. In 1993 Eritrea separated amicably from Ethiopia. In anticipation of Eritrean independence the parents had moved there the previous year, and after Eritrea became independent they acquired Eritrean citizenship and

renounced their Ethiopian citizenship. But the petitioner, though a minor (he was 16 or 17), stayed behind.

In 1998 Ethiopia and Eritrea went to war, and Ethiopia indiscriminately rounded up and expelled some 75,000 Ethiopian citizens. See Human Rights Watch, "The Horn of Africa War," Jan. 29, 2003, www.hrw.org/en/node/12364/section/1 (visited Dec. 14, 2009). The petitioner fled the country before he could be expelled, and eventually wound up in the United States and sought asylum, contending that he'd been stripped of his Ethiopian citizenship and that this was persecution. The immigration judge denied asylum on the ground that since a country has a right to determine who is a citizen, taking away a person's citizenship is not, without more, persecution. The Board affirmed the immigration judge without discussing whether or when denationalization amounts to persecution.

The petitioner turned to this court for relief. Politely describing the immigration judge's reasoning as "problematic," a panel of this court vacated the Board of Immigration Appeals' decision and remanded the case to the Board. *Haile v. Gonzales*, 421 F.3d 493, 496 (7th Cir. 2005). We instructed the Board to consider the relation of denationalization to persecution, and having done so to determine whether the petitioner was still an Ethiopian citizen, which the immigration judge had not bothered to determine since he thought it irrelevant.

On remand, the Board, again denying the application for asylum, opined in response to our first instruction that while denationalization can be "a harbinger of persecu-

tion," the immigration judge "must look at the circum-stances surrounding the loss of nationality or citizenship and then, on an individual basis, determine whether these circumstances rise to the level of persecution due to a protected ground." The Board did not discuss what "circumstances" might satisfy its test, beyond saying that "even if the Ethiopian Government . . . intended to deprive the [petitioner] of his citizenship due to a protected ground, the evidence establishes that these actions did not rise to the level of persecution" (footnote omitted).

The Board based this conclusion on the observation that not *all* denationalizations are instances of persecution. And that is correct. The Board noted instances in which, as a result of altered boundaries, a person finds himself a citizen of a different country. For example, when Czecho-slovakia divided into two countries, the Czech Republic and Slovakia, each former citizen of Czechoslovakia was told to choose between becoming a citizen of the Czech Republic or of Slovakia. When Lithuania, formerly a part of the Soviet Union, became a separate nation, its inhabitants became Lithuanian citizens—and shortly afterward the Soviet Union dissolved, so some 150 million persons lost their Soviet citizenship and became Russian citizens. In none of these cases did the affected individuals become stateless; they simply became citizens of a new state. The petitioner in this case, however, is stateless; there is no contention that his Eritrean ethnicity makes him an Eritrean citizen.

From such observations the Board leapt to the conclusion that even if a person loses his citizenship because of

a "protected ground"—which is to say a ground on which U.S. law permits a person to seek asylum, such as religion—such a loss of citizenship does not, without more, amount to persecution. We asked the Board's lawyer at argument whether this meant that had the United States after the 9/11 terrorist attacks stripped all Muslim citizens of the United States of their U.S. citizenship, but allowed them to remain in the United States, this would not have been persecution—they would have to show additional harm. She said yes. By the same token, the mere fact of Nazi Germany's having denationalized its Jewish citizens in 1941 would not have been persecution, though their subsequent further mistreatment would have been.

We find it hard to believe that that is actually the Board's position. But in any event the Board's conclusion that the petitioner in this case had to prove "denationalization plus" doesn't follow from its premise, and unlike a jury an administrative agency has to provide a reasoned justification for its rulings. E.g., *Guchshenkov v. Ashcroft*, 366 F.3d 554, 559-60 (7th Cir. 2004); *Mengistu v. Ashcroft*, 355 F.3d 1044, 1047 (7th Cir. 2004); *Zamora-Garcia v. INS*, 737 F.2d 488, 490-91 (5th Cir. 1984); *Wong Wing Hang v. INS*, 360 F.2d 715, 719 (2d Cir. 1966) (Friendly, J.). From the correct premise that a change of citizenship incident to a change in national boundaries is not persecution per se, it does not follow that taking away a person's citizenship because of his religion or ethnicity is not persecution. If Ethiopia denationalized the petitioner because of his Eritrean ethnicity, it did so because of hostility to Eritreans; and the analogy to the Nazi treatment of Jews is

close enough to suggest that his denationalization was persecution and created a presumption that he has a well-founded fear of being persecuted should he be returned to Ethiopia. 8 C.F.R. § 208.13(b)(1); *Begzatowski v. INS*, 278 F.3d 665, 671 (7th Cir. 2002); *Galina v. INS*, 213 F.3d 955, 957-58 (7th Cir. 2000); *Cendrawasih v. Holder*, 571 F.3d 128, 130 (1st Cir. 2009). Indeed, if to be made stateless is persecution, as we believe, at least in the absence of any reason for disbelief offered by the Board of Immigration Appeals, see *Giday v. Gonzales*, 434 F.3d 543, 555-56 (7th Cir. 2006); *Mengstu v. Holder*, 560 F.3d 1055, 1059 (9th Cir. 2009), then to be deported to the country that made you stateless and continues to consider you stateless is to be subjected to persecution even if the country will allow you to remain and will not bother you as long as you behave yourself.

At this point the case becomes difficult because of the confused state of the record, and the confusing discussion in the immigration judge's and Board's opinions, concerning the petitioner's status under Ethiopian law. Under that law, unlike American law, Ethiopian citizenship is not automatically conferred on a person born in Ethiopia, but instead requires that the person either be naturalized or have at least one parent who is an Ethiopian citizen. Ethiopian Constitution, art. 6, § 1; Ethiopian Nationality Law of 1930, § 1, www.unhcr.org/refworld/docid/3ae6b52ac.html (visited Dec. 14, 2009); U.K. Home Office, Research Development Statistics, "Country of Origin Information Report—Ethiopia" ¶ 31.01 (Apr. 11, 2007), www.homeoffice.gov.uk/rds/pdfs07/ethiopia-300407.doc

(visited Nov. 17, 2009). It is unclear what happens to a minor who is an Ethiopian citizen by virtue of his parents' Ethiopian citizenship when the parents renounce that citizenship. The Board did not try to resolve the issue. Instead it assumed for argument's sake that if the petitioner had lost his citizenship, it was because of the hostility of the Ethiopian government to persons of Eritrean ethnic origin; and it then asked itself whether the petitioner could reclaim his citizenship. Whether the Board meant that he could acquire citizenship or could establish that he is already a citizen is among the many opacities in this case.

Apparently in regret or embarrassment about its treatment of Ethiopians of Eritrean ethnicity (for there is no suggestion that the denationalization of such persons was a justifiable measure for eliminating a potential "fifth column" during Ethiopia's war with Eritrea), in 2003 Ethiopia passed a law allowing persons who had lost their Ethiopian nationality because of their acquisition of a foreign nationality to regain it by returning to live in Ethiopia, renouncing their foreign citizenship, and applying for readmission to Ethiopian citizenship. Proclamation on Ethiopian Nationality, No. 378/2003, § 22 (Dec. 23, 2003), www.unhcr.org/refworld/docid/409100414.html (visited Dec. 14, 2009). The record does not indicate whether readmission is automatic upon application, since persons who never acquired foreign citizenship cannot renounce it. From other sources we gather that readmission is not automatic and that returning Ethiopians of Eritrean ethnicity are often denied full rights of citizenship. Bronwen Manby, *Struggles for Citizenship in*

*Africa*, p. 104 (2009); Open Society Justice Initiative, *Discrimination in Access to Nationality*, p. 4 (Apr. 2009), http://lib.ohchr.org/HRBodies/UPR/Documents/Session6/ET/OSJI_ETH_UPR_S06_2009.pdf; Refugees International, *Nationality Rights for All*, pp. 19, 30 (Mar. 2009), http://www.reliefweb.int/rw/RWFiles2009.nsf/FilesByR W D o c U n i d F i l e n a m e / M Y A I - 7 Q 3 3 7 R - full_report.pdf/$File/full_report.pdf; Maureen Lynch & Katherine Southwick, *Ethiopia-Eritrea: Stalemate Takes Toll on Eritreans and Ethiopians of Eritrean Origin* (May 30, 2008), www.refugeesinternational.org/sites/default/files/Ethiopia_stateless0530.pdf. (All these web sites were visited on Dec. 14, 2009.) We do not vouch for these sources, but they suggest that the readmission law cannot be taken at face value—that evidence is needed concerning its meaning and application.

It's not as if the law simply reinstated the Ethiopian citizenship of all persons who had lost it because of their Eritrean ethnicity; the Board would then have had a stronger ground for denying asylum to the petitioner. He would then have had to show either that he faced persecution even as a returning citizen or that the mistreatment of citizens of Eritrean ethnicity during the war had been so outrageous (like the Nazi treatment of the Jews) that a compelled return to Ethiopia even with citizenship restored and apologies from one's former persecutors would be a cruelty warranting what is termed "humanitarian" asylum. 8 C.F.R. § 208.13(b)(1)(iii); *Tadesse v. Gonzales*, 492 F.3d 905, 912 (7th Cir. 2007); *Brucaj v. Ashcroft*, 381 F.3d 602, 608-09 (7th Cir. 2004); *Lopez-Galarza v. INS*, 99 F.3d 954, 960-61 (9th Cir. 1996).

Thus far we have assumed, as did the Board and the government's lawyer in this court, that the petitioner is at least eligible to be considered for obtaining Ethiopian citizenship under the readmission law. But this appears to be incorrect. The law by its terms is applicable only to "a person who was an Ethiopian national *and has acquired foreign nationality*" (emphasis added). The petitioner has not acquired foreign nationality. He is stateless. Maybe despite its language the readmission law is applicable to him, but we cannot assume that; there is no discussion of the issue by the Board.

The Board did note that the Ethiopian Embassy is willing to give the petitioner a document called a *laissez-passer* that will permit him to enter Ethiopia. Like a visa but unlike a passport, it is a one-time entry permit, but there is evidence that the Ethiopian Embassy in the United States grants *laissez-passer* to Ethiopian citizens in lieu of passports because of a problem with the embassy's equipment for printing passports. According to a statement by a deportation officer, "A laissez passer is issued when enough information has been provided to give rise to the belief that the person is an Ethiopian citizen. A laissez passer will include the following information about the applicant . . . . The government of Ethiopia issued this document based upon its belief that it has enough information to presume the applicant is an Ethiopian citizen." The word "presume" is troublesome, as for all we know the presumption may be rebutted by Ethiopian officials when the petitioner arrives in Ethiopia. It is also unclear whether a *laissez-passer* is issued only to a person believed to be a citizen. The statement of the deportation

officer does not resolve the ambiguity as to what may await the petitioner if he is returned to Ethiopia.

The petition for review is granted and the case is returned to the Board for further proceedings consistent with this opinion.