In the

# United States Court of Appeals

## For the Seventh Circuit

No. 21-2099

MATHUSALA MENGHISTAB,

*Petitioner*,

*v.*

MERRICK GARLAND, Attorney General of the United States,

*Respondent*.

Petition for Review of an Order
of the Board of Immigration Appeals.
No. A026-649-212

SUBMITTED JANUARY 5, 2022 — DECIDED JUNE 21, 2022

Before KANNE,[1] WOOD, and BRENNAN, *Circuit Judges*.

WOOD, *Circuit Judge*. Petitioner Mathusala Menghistab, at the time a lawful permanent resident of the United States, pleaded guilty to rape in Indiana state court in 2011. Soon thereafter, the Department of Homeland Security (the

---

[1] Circuit Judge Kanne died on June 16, 2022, and did not participate in the decision of this case, which is being resolved under 28 U.S.C. § 46(d) by a quorum of the panel.

Department) began the process of removing him to Ethiopia. Because of his rape conviction and resulting sentence, Menghistab was barred from most forms of relief, including asylum, discretionary withholding of removal, and waiver of removability. He was eligible only to apply for deferral of removal under the Convention against Torture, and he did so. An immigration judge denied him relief and the Board of Immigration Appeals (the Board) affirmed. But the removal process was interrupted when Ethiopia refused to issue Menghistab a travel document. He was released from custody in 2013 and continued to live in the United States until, in late 2020, Ethiopia changed course and agreed to issue the travel document.

That development prompted Department officials to detain Menghistab pending removal. He moved to reopen his case, citing the changed circumstances in Ethiopia since his proceedings closed, occasioned by the outbreak in November 2020 of the civil war in the Tigray region in northern Ethiopia. The Tigray War has resulted in widespread attacks on civilians. Ethnic Eritreans, such as Menghistab, have suffered particularly severe human-rights violations. The Board denied the motion without an evidentiary hearing, and Menghistab petitioned this court for review. We conclude that a new hearing is needed to address two key issues: the materiality of the war to Menghistab's risk of torture; and the question whether Menghistab is an Ethiopian citizen. We therefore grant Menghistab's petition for review and remand for further proceedings.

**I**

The events giving rise to this case date back hundreds of years, to the emergence of the numerous ethnolinguistic

groups that together make up modern Ethiopian society. In the interest of brevity, though, we begin the story in 1977, when Colonel Mengistu Haile Mariam took power in Ethiopia. Colonel Mengistu ruled Ethiopia as a Marxist dictator, imprisoning many political prisoners. One of them was Menghistab's father, who was detained and jailed on several occasions during the late 1970s and early 1980s. The Menghistab family is of Eritrean origin, and during that period Eritrean revolutionaries were waging a war of independence against the Ethiopian government. Menghistab's father apparently was detained because he was suspected of supporting the independence movement. Shortly after a stint behind bars ended in 1982, Menghistab's father was able to obtain a student visa, which the family used to flee to the United States.

In 1988, Menghistab and his family were granted asylum. Menghistab adjusted status to become a lawful permanent resident a year later. He has resided in the United States ever since. Menghistab's parents became naturalized citizens around 2000, but Menghistab never took that step. In 2010, Menghistab's parents traveled to Ethiopia on U.S. passports. They were detained briefly at the airport but were then permitted to enter and were not subjected to any further adverse treatment during their trip. As best we can tell from the record, Menghistab himself has not traveled to Ethiopia since his family fled the country in 1982.

In 2011, in an Indiana state court, Menghistab was charged with and pleaded guilty to rape. Upon learning of that conviction, the Department of Homeland Security asserted that he was removable as an aggravated felon. See 8 U.S.C. § 1227(a)(2)(A)(iii) ("Any alien who is convicted of an aggravated felony at any time after admission is deportable."); *id.*

§ 1101(a)(43)(A) (defining "aggravated felony" to include "rape"). Because of his rape conviction and resulting six-year sentence, Menghistab was ineligible for asylum, discretionary withholding of removal, and a waiver of removability. He sought and was denied deferral of removal pursuant to the Torture Convention, but, as we have explained, he was not removed in 2013 because Ethiopia refused to issue an appropriate travel document.

To explain events since 2013, we must briefly return to the historical narrative. In 1991, Eritrea won *de facto* independence from Ethiopia, with *de jure* independence following two years later. Since that time, Eritrea has been ruled by an oppressive dictatorship led by Isaias Afwerki. Also in 1991, an Ethiopian revolutionary coalition overthrew Colonel Mengistu. The Tigray People's Liberation Front (TPLF) spearheaded that coalition. The word "Tigray" in that organization's name refers to a region in Ethiopia's far north, along the border with Eritrea. Tigrayans, who reside mainly in that region, are the fourth-largest ethnic group in Ethiopia, making up about six percent of the population. Despite their limited population share, Tigrayans have dominated post-revolutionary Ethiopian politics because of the TPLF's central role in overthrowing the Mengistu dictatorship. Importantly for our purposes, Tigrayans are not the same ethnic group as the Tigrinya or the Tigre, the two largest ethnic groups in Eritrea. (That said, the Eritrean Tigrinya and the Ethiopian Tigrayans speak different dialects of the same language, which is—confusingly—also called Tigrinya, while the Tigre speak a closely related but not mutually intelligible language called Tigre.)

Ethiopia, led by the TPLF, and Eritrea, led by Afwerki, fought a bloody war from 1998 to 2000. (A cold(er) war

continued until 2018.) During the period of active belliger-
ence, the Ethiopian government expelled thousands of ethnic
Eritreans, including many who held Ethiopian citizenship. A
substantial population also moved in the other direction. As a
result of the violence and destabilization along the border
during the war, as well as the depressed economic conditions
in Eritrea and the oppressive practices of the Afwerki regime,
a large Eritrean refugee community wound up in Ethiopia.
Before the ongoing Ethiopian civil war broke out, many of
those refugees were residing in camps in Tigray.

In April 2018, Abiy Ahmed Ali became the prime minister
of Ethiopia. Abiy is an ethnic Oromo, not a Tigrayan. The
Oromo are the plurality ethnic group in Ethiopia, accounting
for about 35 percent of the overall population. They reside
mainly in the south, south-central, and west-central portions
of the country. Though he was a member of a party in the rul-
ing coalition when elected, Abiy's election marked a sea
change in Ethiopian politics, because it brought about the end
of Tigrayan domination of that coalition. Since he took office,
Abiy has marginalized the TPLF and its political supporters,
designating the organization as a terrorist group and recon-
stituting the ruling coalition to exclude Tigrayans. Abiy also
has negotiated a peace agreement and diplomatic thaw with
Eritrea, formally ending the cold war that had been in place
since open hostilities between the two countries ended in
2000. For his efforts, Abiy was awarded the 2019 Nobel Peace
Prize.

In November 2020, a civil war broke out between Tig-
rayans and the Abiy-led Ethiopian central government, with
most fighting concentrated in Tigray. We draw our account of
the events of that war, which has continued to unfold while

this case has been pending, from both the evidence in the record and the State Department's Country Reports for Ethiopia and Eritrea. See *Ayele v. Holder*, 564 F.3d 862, 872–73 (7th Cir. 2009) (recognizing that a court may take judicial notice of Country Reports and other similar sources when they provide the "most recent evidence" of a relevant country's changing conditions). The civil war was immediately marked by widespread war crimes committed by both sides. For instance, the State Department reports that the TPLF executed "approximately 500" "non-Tigrayan seasonal laborers" *en masse* in a single incident less than a week into the war. U.S. Dep't of State, 2020 Country Reports on Human Rights Practice: Ethiopia, at https://www.state.gov/reports/2020-country-reports-on-human-rights-practices/ethiopia. Ethiopian state forces quickly countered with similar atrocities against ethnic Tigrayans. Such events led the U.S. Secretary of State in March 2021 to describe the events in Tigray as "ethnic cleansing." See CNN Politics, "Blinken: Acts of 'ethnic cleansing' committed in Western Tigray," Mar. 10, 2021, at https://www.cnn.com/2021/03/10/politics/blinken-tigray-ethnic-cleansing/index.html.

Eritrea, too, has played a significant role in the conflict. Shortly after fighting broke out, Eritrea joined the hostilities on the side of the Ethiopian government. Its main purpose in doing so appears to have been to use the war as cover to kill or forcefully repatriate the Eritrean refugees in Tigray, many of whom are hostile to the Afwerki regime. According to the State Department's most recent reports, Eritreans in Tigray (caught, it seems, between a rock and a hard place) have suffered some of the worst atrocities of the war. See U.S. Dep't of State, 2021 Country Reports on Human Rights Practices: Eritrea, at https://www.state.gov/reports/2021-country-reports-

on-human-rights-practices/eritrea. Human-rights organizations and the State Department agree that the war has resulted in the extrajudicial killing of Eritrean refugees and the weaponization of rape. As a consequence, in late 2020, thousands of Eritrean refugees fled Tigray in the direction of Addis Ababa. Reliable statistics since then are exceedingly hard to come by, but it appears to be well within the realm of plausibility that a *majority* of the Eritrean refugees in Tigray who did not flee the war zone in time have now been killed or disappeared—most likely by means of forceful repatriation to Eritrea or conscription. See U.S. Dep't of State, 2021 Country Reports on Human Rights Practices: Ethiopia, at https://www.state.gov/reports/2021-country-reports-on-human-rights-practices/ethiopia (noting that as of October 2021, the United Nations High Commissioner for Refugees "could not account for the whereabouts of more than 6,000 Eritrean refugees" in Tigray). And those who remain have been subjected to extreme violence, torture, starvation, rape, and displacement. In short, Tigray is presently one of the most dangerous places on earth, and the Eritrean refugees who are still in the region risk death or torture on a near-daily basis.

The same sources paint a similarly dire picture of conditions in Eritrea. The State Department reports that the Afwerki regime carries out "arbitrary or unlawful killings" on a regular basis and often subjects political prisoners and other detainees to physical and psychological torture. U.S. Dep't of State, 2020 Country Report on Human Rights Practices: Eritrea, at https://www.state.gov/reports/2020-country-reports-on-human-rights-practices/eritrea. One frequently used torture method described in the State Department's 2020 report—nicknamed "helicopter"—entails tying the prisoner's hands and legs behind him, then leaving him face-down on

the ground for 48 hours or more. *Id.* And the risk of oppressive treatment is considerable even for civilians not in formal detention. Nearly all Eritrean citizens between the ages of 18 and 50 are legally obligated to perform so-called "national service." This often entails conscripted military service in the Eritrean armed forces now fighting in Tigray. National service may also entail unpaid forced labor—for instance, working "72-hour weeks in a mine." *Id.* And citizens' terms in national service often last indefinitely "under threats of detention, torture, or punishment of their families." *Id.* In some documented cases, terms of forced labor justified as national service have lasted as long as 17 years. *Id.*

With recent developments in hand, we return once again to Menghistab. Just a few weeks after the Tigray War broke out, Ethiopia changed course and issued him a travel document. The record does not shed any light on the reasons for the about-face, or on the odd timing. Nor does the record make clear what sort of document Ethiopia issued. In this court's past experience, Ethiopia will sometimes issue a *laissez-passer*, rather than a passport, to deportees from the United States. See *Haile v. Holder*, 591 F.3d 572, 575–76 (7th Cir. 2010). A *laissez-passer* is a limited-purpose travel document that does not establish the bearer's citizenship.

After Ethiopia issued the travel document, Immigration and Customs Enforcement, intending to execute the still-valid order of removal, detained Menghistab. Menghistab then moved to reopen his case in light of the changed circumstance of the Tigray War. The Board denied his motion. It concluded that although Menghistab had met his burden to show that conditions had changed in Ethiopia, he had not shown that the change was material to his claim to relief under the

Convention. The Board did not conduct a new evidentiary hearing, relying instead on the evidence already in the record as well as that submitted by Menghistab with his motion to reopen. We granted Menghistab a stay of removal pending disposition of his petition for review.

## II

The Convention forbids the removal of "a person to another State where there are substantial grounds for believing that he would be subjected to torture." Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, art. 3(1), Dec. 10, 1984, 1465 U.N.T.S. 85. Federal regulations provide for two remedies pursuant to the Convention: withholding of removal, 8 C.F.R. § 208.16(c); and deferral of removal, *id.* § 208.17. Both remedies permit a noncitizen to remain in the United States upon a showing of "a substantial risk" that she "will be tortured if removed." *Rodriguez-Molinero v. Lynch*, 808 F.3d 1134, 1136 (7th Cir. 2015). Deferral of removal is, however, more limited than withholding. Even if granted at first, deferral may later be terminated, on the Department's motion, if an immigration judge concludes that the noncitizen can no longer show a substantial risk of torture. 8 C.F.R. § 208.17(d). Because of his rape conviction, Menghistab is eligible only for deferral of removal. See *id.* § 208.16(d)(2). At this juncture, though, we are not directly concerned with the merits of his entitlement to that relief. The only question before us relates to the denial of his motion to reopen.

We review for abuse of discretion the Board's denial of a motion to reopen. *Xiao Jun Liang v. Holder*, 626 F.3d 983, 988 (7th Cir. 2010). Normally, motions to reopen must be made within 90 days of a final order. 8 U.S.C. § 1229a(c)(7)(C)(i). But

an exception may apply when the motion "is based on changed country conditions arising in the country of nationality or the country to which removal has been ordered" and the change of conditions is "material." *Id.* § 1229a(c)(7)(C)(ii); see also 8 C.F.R. § 1003.2(c)(3)(ii). The parties agree that country conditions in Ethiopia have changed. They disagree, however, over whether the changes are material to Menghistab's entitlement to deferral of removal.

In addition to identifying a material change in country conditions, Menghistab also has the burden to establish "prima facie eligibility for the underlying relief sought." *Boika v. Holder*, 727 F.3d 735, 738 (7th Cir. 2013) (discussing general rules for motions to reopen in the removal context). We review the Board's findings of fact bearing on that aspect of Menghistab's petition under "the substantial-evidence standard," meaning that "'the agency's findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Nasrallah v. Barr*, 140 S. Ct. 1683, 1692 (2020) (quoting 8 U.S.C. § 1252(b)(4)(B)).

We review any relevant questions of law—"whether American, foreign, or international"—*de novo*. *Garcia v. Pinelo*, 808 F.3d 1158, 1162 (7th Cir. 2015) (citing FED. R. CIV. P. 44.1).

A

We begin with the question whether Ethiopia will consider Menghistab to be its citizen. The Board concluded that it would. It asserted that Menghistab has "admit[ted] that he is an Ethiopian citizen by birth" and framed the materiality analysis in terms of "how Ethiopian *citizens* of Eritrean ethnicity are currently being treated in Ethiopia." (Emphasis added.) We review the Board's factual findings underpinning

its citizenship determination deferentially, but the ultimate question of Menghistab's citizenship is one of law, not of fact, and so we review *de novo* the Board's conclusion on that point. See *Garcia*, 808 F.3d at 1162; see also FED. R. CIV. P. 44.1 ("The court's determination [of foreign law] must be treated as a ruling on a question of law."). Reasoning through foreign law is "notoriously difficult, because the U.S. reader is likely to miss nuances in the foreign law, to fail to appreciate the way in which one branch of the other country's law interacts with another, or to assume erroneously that the foreign law mirrors U.S. law when it does not." *Bodum USA, Inc. v. La Cafetière, Inc.*, 621 F.3d 624, 638–39 (7th Cir. 2010) (Wood, J., concurring). Accordingly, we proceed with a healthy measure of caution.

Considerable difficulty arises from the circumstances of Eritrea's independence, which was achieved on May 24, 1993, and its relationship with Ethiopia over the years. See CIA World Factbook, Eritrea, Government, at https://www.cia.gov/the-world-factbook/countries/eritrea/#government. Menghistab concedes that he was born in Addis Ababa (Ethiopia's capital) in 1969. But that settles little. In contrast with U.S. nationality law, which is characterized by a *jus soli* conception of citizenship, Ethiopian law employs a *jus sanguinis* logic. See Ethiopian Constitution, art. 6, § 1; Ethiopian Nationality Law of 1930, § 1. Which is to say, Ethiopian citizenship turns on parentage, not place of birth. In 1969, when Menghistab was born, Ethiopia claimed all of the territory that comprises present-day Eritrea and did not recognize Eritrea as a country—and so, necessarily, it did not acknowledge even the possibility of Eritrean citizenship. The Board was thus correct that *at birth* Menghistab was an Ethiopian citizen. But now that Ethiopia does recognize the

Eritrean State, Menghistab's status falls into a lacuna in Ethiopian nationality law. By that law's present logic, Menghistab would be Eritrean, not Ethiopian, because his parents were Eritrean. The question, then, is whether Ethiopia will determine Menghistab's citizenship based on legal conditions at the moment of his birth, or instead at the moment of his return to Ethiopia (should he be sent there).

This is not the first time we have faced this question. In *Haile v. Holder*, 591 F.3d 572, 574–76 (7th Cir. 2010), we considered the asylum application of an ethnic Eritrean born (as was Menghistab) in Addis Ababa in the late 1960s who alleged that he would be deemed Eritrean and stripped of his Ethiopian citizenship if deported to Ethiopia. As of 2010, the *Haile* court found "that readmission is not automatic and that returning Ethiopians of Eritrean ethnicity are often denied full rights of citizenship." *Id.* at 575.

Our own review of the record and the relevant provisions of Ethiopian law give us no reason to disagree with *Haile*'s conclusions. Evidence in the record establishes that Ethiopian nationals of Eritrean origin often have been reclassified by Ethiopia as Eritrean citizens. In the aftermath of the 1993 Eritrean independence referendum, most of those people who registered to vote were presumed to have elected Eritrean citizenship and were treated by the Ethiopian government—which applies a near-categorical bar to dual citizenship—as having renounced any claim to be Ethiopians. Another wave of denaturalizations documented in the record came with the 1998 Ethiopian–Eritrean War (though at least some of those who were denaturalized during that conflict later had their Ethiopian citizenship reinstated by the 2003 Proclamation).

The government in our case has not identified any source that casts doubt on *Haile*'s conclusions about Ethiopia's more recent treatment of returning persons of Eritrean ethnicity. In short, while we cannot fully rule out that Ethiopia will treat Menghistab as one of its citizens if he is removed, that outcome is far from certain. On the record that we have, we cannot share the Board's confidence about what will happen. And, as we now explain, recent events establish that Menghistab's citizenship may well be material to his risk of torture.

B

For his motion to reopen to succeed, Menghistab must demonstrate that the changed conditions in Ethiopia or Eritrea are material to his risk of torture. The Convention defines torture broadly, to include

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

Convention against Torture, art. 1(1).

Menghistab suggests two sequences of events that could result in his being tortured. First, Menghistab argues that he

may be tortured within Ethiopia if he is treated as an Eritrean refugee. As we have explained, the plight of Eritrean refugees in Ethiopia is, at present, dire. Thousands have been executed *en masse* by the militaries and militias fighting in Tigray. Thousands more have been tortured, displaced, raped, and starved. The Board seemed to credit the factual accuracy of Menghistab's submissions, which thoroughly detail these atrocities. It discounted Menghistab's argument only because it considered the treatment of Eritrean *refugees* in Ethiopia to be irrelevant to the fate of an *Ethiopian* citizen of Eritrean ethnicity. But if Menghistab is correct that Ethiopia will consider him an Eritrean refugee rather than an Ethiopian citizen, his submissions become relevant. Menghistab may, for instance, be transported to a refugee camp in or near Tigray or be turned over to the Eritrean forces now operating inside Ethiopia with permission from the Ethiopian central government. If either of those eventualities came to pass, overwhelming evidence suggests that Menghistab would be tortured or executed.

And even if Menghistab manages to avoid detention and remain in the capital region, where fighting has not so far occurred, he may still be tortured in the event of a crackdown on the Eritrean refugee population now flocking to Addis Ababa. Eritreans remain deeply unpopular with large portions of the Ethiopian public. The future treatment of the refugees who escape the fighting is an unpredictable flash point in Ethiopian politics. Moreover, Menghistab has submitted unrebutted evidence that his name is recognizably Eritrean and that he does not speak the languages of the politically ascendant non-Eritrean and non-Tigrayan ethnic groups. He is thus a likely target in the event of any crackdown.

Second, Menghistab argues that he also may be tortured in Eritrea, in the event that Ethiopia elects to send him there. As it did with his refugee theory, the Board discredited this possibility because it assumed Menghistab would be treated as an Ethiopian citizen, not because it disagreed with Menghistab's account of changed country conditions in Eritrea. As we have explained, those conditions are horrific. And the 2018 peace accord and ongoing military cooperation between Ethiopia and Eritrea have rendered immigration-enforcement cooperation between the two countries more feasible than it was when Menghistab was first ordered removed. Thus, to the extent that the Board misjudged Menghistab's citizenship, this theory may also establish a material change of conditions.

## C

The Board also concluded that Menghistab's failure to show his *prima facie* eligibility for Convention relief provided an independent basis to deny his motion. See *Boika*, 727 F.3d at 738. A *prima facie* showing, though required, is not quite the barrier to reopening the Board takes it to be. All *Boika* mandates is that a petitioner present "sufficient evidence to demonstrate a reasonable likelihood of success on the merits so as to make it worthwhile to develop the issues further at a full evidentiary hearing." *Id.* at 742. As we have explained, Menghistab has made out a reasonable case that Ethiopia may not regard him as an Ethiopian citizen. In that case, he faces a real possibility of torture. At this stage in the proceedings, that suffices.

## III

In his motion to reopen, Menghistab put forward considerable evidence establishing that the war in Tigray and

accompanying military cooperation between Ethiopia and Eritrea have increased the risk that Eritreans in Ethiopia will be tortured. The Board's main quibble was with the relevance of that evidence to an Ethiopian citizen, which it assumed Menghistab to be. But that assumption was not warranted on the record that was before the Board. Denying the motion to reopen without a full hearing addressing Menghistab's citizenship and its materiality to his risk of torture was therefore an abuse of discretion. Accordingly, we grant the limited relief described below.

Before doing so, however, we note briefly the things we do not decide today. First, we do not decide that Menghistab has shown a material change of conditions. That decision, and the decision whether to grant the motion to reopen, is the Board's to make in the first instance after it has conducted an adequate hearing. Second, we do not resolve the question of Menghistab's citizenship. That, too, is for the Board, though only its fact-finding—not its legal conclusions—will be entitled to deference in the event of further review by this Court. Third, we do not decide whether Menghistab is entitled to deferral of removal under the Convention against Torture.

The petition for review is GRANTED and the case is REMANDED to the Board of Immigration Appeals. On remand, the Board (or if it so chooses, an immigration judge) should conduct an evidentiary hearing that addresses (1) whether Ethiopia is likely to consider Menghistab to be one of its citizens; (2) whether changed conditions in Ethiopia are material to the risk that Menghistab will be tortured if removed; and (3) whether changed conditions in Eritrea are material to the risk that Menghistab will be tortured if removed.