**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RUTH AYNOM MENGSTU,

*Petitioner,*

v.

ERIC H. HOLDER, JR., Attorney
General,

*Respondent.*

No. 05-71825

Agency No.
A096-146-985

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
February 12, 2009—San Francisco, California

Filed March 27, 2009

Before: Dorothy W. Nelson, William A. Fletcher and
Richard C. Tallman, Circuit Judges.

Opinion by Judge D.W. Nelson

---

## COUNSEL

Anthony J. Patek, Cooley Godward LLP, San Francisco, California; Dennis Muchnicki, Dublin, Ohio, for the petitioner.

Michael Gordon Latour & Andrew Oliveria, Office of Immigration Litigation, Department of Justice, Civil Division, Washington, D.C., for the Government.

---

## OPINION

D.W. NELSON, Senior Circuit Judge:

Petitioner Ruth Aynom Mengtsu petitions this court for review of the Board of Immigration Appeals' denial of her application for asylum. We have jurisdiction pursuant to 8 U.S.C. § 1252(a)(1). We grant the petition for review, remanding for proceedings consistent with this opinion.

## I.  STATEMENT OF FACTS

Ruth Aynom Mengtsu is an Ethiopian national of Eritrean descent. She was born in 1976 in Asmara, Ethiopia.[1] When she was five years old, she moved to Addis Ababa, the Ethiopian capital, with her family. Mengtsu completed high school and studied at a technical school for two years, graduating in 1995. She married, and, in 1999, sought employment because she felt that she "should leave the house and be productive." She was hired as a secretary in a glass work store. The owner, Robel Berhe, was also Eritrean, as were several of his employees.

In May 1998, armed conflict erupted between Ethiopia and Eritrea. During the war, approximately 75,000 Ethiopians of Eritrean origin were forcibly expelled and bused to Eritrea. The justification for these expulsions was simply suspect status as "Eritreans." People in urban areas were frequently arrested in their homes or workplaces. Arrestees were typically interned, often under very harsh conditions, prior to deportation.

In February 1999, Mengstu's husband was deported. According to Mengtsu's testimony, the Ethiopian police "just picked him up and took him away." He was in the business district at the time, and the police were deporting Eritreans in the vicinity.

On March 10, 2000, over a year later, seven or eight members of the Ethiopian police came to Mengtsu's store and stated that all of the Eritreans in the store had to leave the country. The police spoke to Berhe, the owner, who relayed the officers' statements to the employees. Berhe confirmed that there were Eritreans working in the store, identifying

---

[1] After Eritrea declared its independence from Ethiopia in 1993, Asmara became the capital of Eritrea.

them on a list. The police further stated that the Eritreans should get their identity papers from the Immigration Office.

Mengtsu obtained the identity paper from the Immigration Office on March 15, 2000. She provided the Immigration Judge ("IJ") with a copy of the paper, explaining that it was issued in lieu of a passport and served as "the identity paper to non-Ethiopians, which they considered non-Ethiopians. It's an emergency paper issued to people who had to leave from Ethiopia to go out of the country." The document was titled "Emergency Document of Identity to a *non-Ethiopian National* who cannot Obtain, or owing to Emergent Circumstances, has no time to Obtain a National Passport or renew an Expired one." (emphasis added). It identified Mengstu as "proceeding to Sudan," and was not valid for reentry to Ethiopia. Her nationality was listed as "Eritrean."

Mengtsu flew from Addis Ababa with Berhe to Khartoum, the capital of the Sudan, on March 25, 2000. Mengtsu showed the Sudanese officials her Ethiopian identity paper and entered the country. There was no Sudanese stamp on her visa, and she was not interviewed by immigration officials.

Shortly after she arrived in the Sudan, Mengtsu went to Abba Kansa, a refugee camp operated by the Red Cross, located outside of Khartoum. She was not directed to the camp by Sudanese officials; she simply believed that she would know people there. She remained there for two years.

When Mengtsu's husband was deported to Eritrea in 1999, he was forcibly conscripted into the Eritrean army. She contacted him by sending letters through traders and by asking people who traveled to Eritrea to send word to him of her whereabouts. He deserted the army and entered the Sudan, smuggling himself into the country illegally in September 2001.

The Sudanese government did not offer Mengtsu or her husband citizenship or permanent residence during their stays.

Mengtsu did not open a Sudanese bank account. According to the Human Rights Watch report, the government of the Sudan did not give Eritrean deportees a "warm reception." When asked why she remained there for two years, she stated that she could not find an agent to process her paperwork so that she could leave. Mengtsu eventually procured a false passport, and traveled to the United States, arriving on February 14, 2002.

Mengtsu last contacted her husband, who is still living in the Sudan, about two months prior to her hearing. When asked how he was supporting himself, Mengtsu testified that her husband's living standard was "very, very bad. He just gets along with this one and that one." When asked what would happen if she returned to the Sudan, she stated that she "has nothing there." She stated that she had no job and that she and her husband depleted their funds sending her to the United States.

Mengtsu appeared in removal proceedings and conceded removability. She declined to designate a country of removal and applied for asylum, withholding of removal, and protection under the Convention Against Torture. The IJ denied Mengtsu's application and designated Ethiopia as the country of removal. The IJ found that Mengtsu was not subject to past persecution because she had been a "war refugee" as defined in the United Nations High Commission for Refugees' *Handbook on Procedures and Criteria for Determining Refugee Status* (1979) (the "Handbook"). He also found that she had firmly resettled in the Sudan. The IJ made no express finding as to whether she had a well-founded fear of future persecution.

On March 2, 2005, the BIA summarily affirmed the IJ's decision. Mengtsu subsequently petitioned this court for review of her asylum claim.

## II.    STANDARD OF REVIEW

"Where the BIA adopts the findings and reasoning of the IJ, this court reviews the decision of the IJ as if it were that of the BIA." *Farah v. Ashcroft*, 348 F.3d 1153, 1156 (9th Cir. 2003). The court must uphold factual findings of the IJ if they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992) (quoting 8 U.S.C. § 1105a(a)(4)). "To reverse the BIA finding we must find that the evidence not only *supports* that conclusion, but *compels* it." *Id.* at 481 n.1. "We review questions of law, and the application of legal principles to facts, de novo." *Hoque v. Ashcroft*, 367 F.3d 1190, 1195 (9th Cir. 2004).

## III.    DISCUSSION

The Attorney General may grant asylum to any applicant who qualifies as a "refugee." 8 U.S.C. § 1158(b)(1). A refugee is a person who is unable or unwilling to return to his country of origin "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A); *INS v. Cardoza-Fonseca*, 480 U.S. 421, 428 (1987).

A.    ASYLUM ELIGIBILITY

> In order to establish eligibility for asylum on the basis of past persecution, an applicant must show: (1) an incident, or incidents, that rise to the level of persecution; (2) that is "on account of" one of the statutorily-protected grounds; and (3) is committed by the government or forces the government is either "unable or unwilling" to control.

*Navas v. INS*, 217 F.3d 646, 655-56 (9th Cir. 2000) (internal citations omitted).

**[1]** The IJ concluded that there was no nexus with a statutorily protected ground because Mengstu was a "war refugee." In answering this question, the IJ considered the Handbook, which states that "[p]ersons compelled to leave their country of origin as a result of international or national armed conflicts are not normally considered refugees." Handbook, ¶ 164.

**[2]** This court, however, has found that "[p]ersons fleeing or remaining outside a country for reasons pertinent to refugee status qualify as Convention refugees, regardless of whether those grounds have arisen during conflict." *Ndom v. Ashcroft*, 384 F.3d 743, 753 (9th Cir. 2004), *superseded by statute on other grounds*, REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231, *as recognized in Parussimova v. Mukasey*, 533 F.3d 1128, 1133 (9th Cir. 2008). "[E]ven in situations of widespread civil strife, it is irrelevant whether one person, twenty persons, or a thousand persons were targeted or placed at risk, so long as there is a nexus to a protected ground." *Id.* at 754 (internal citation and quotation marks omitted); *see also Sinha v. Holder*, ___ F.3d ___, Nos. 04-73843, 07-72289, slip op. 1563, 1575 (9th Cir. Feb. 10, 2009); *Ahmed v. Kiesler*, 504 F.3d 1183, 1195 n.9 (9th Cir. 2007) ("[E]ven though generalized violence as a result of civil strife does not necessarily qualify as persecution, neither does civil strife eliminate the possibility of persecution. The relevant analysis is still whether the persecutor was motivated by one of five statutory grounds.") (internal citation omitted); *Knezevic v. Ashcroft*, 367 F.3d 1206, 1211 (9th Cir. 2004) (finding that Serbian petitioners who fled Drvar during the civil war were entitled to asylum because they were fleeing "hostile forces motivated by a desire to kill each and every member of that group").

**[3]** The Ethiopian-Eritrean civil war was ethnically tinged. Because the Ethiopian government solely targeted "Eritreans" for deportation and denationalization, the IJ's finding that no

nexus to a protected ground existed was not supported by substantial evidence.

**[4]** The IJ did not make an express finding as to whether or not Mengtsu was the victim of "an incident, or incidents, that rise to the level of persecution." *See Navas*, 217 F.3d at 655-56. Like the Seventh Circuit, we find it "arguable that such a program of denationalization and deportation is in fact a particularly acute form of persecution," and we remand to the agency to answer this question in the first instance. *See Haile v. Gonzales*, 421 F.3d 493, 496-97 (7th Cir. 2005). We also note that the IJ made no express findings as to well-founded fear.

## B.   FIRM RESETTLEMENT

**[5]** An eligible applicant may not be granted asylum if he or she "was firmly resettled in another country prior to arriving in the United States." 8 U.S.C. §1158(b)(2)(A)(vi). Pursuant to regulation, "[a]n alien is considered to be firmly resettled if, prior to arrival in the United States, he or she entered into another country with, or while in that country received, an offer of permanent resident status, citizenship, or some other type of permanent resettlement." 8 C.F.R. § 1208.15.

"DHS bears the initial burden of showing that the government of the third country issued to the alien a formal offer of some type of official status permitting the alien to reside in that country indefinitely." *Maharaj*, 450 F.3d at 976; *see also Ali v. Ashcroft*, 394 F.3d 780, 789-90 (9th Cir. 2005) (finding that an alien who resided in Ethiopia for five years but who never received any aid or legal status was not firmly resettled); *Camposeco-Montejo v. Ashcroft*, 384 F.3d 814, 820-21 (9th Cir. 2004) (finding that petitioner had not firmly resettled despite living in Mexico for sixteen years because he was not offered permanent status and his movements were restricted).

"This burden can be met by direct evidence of an offer of some type of permanent resettlement." *Maharaj*, 450 F.3d at 976. Alternatively, "if DHS shows that direct evidence of a formal offer is unobtainable, then surrogate, non-offer-based evidence may suffice for the initial showing if it is of sufficient force for the IJ reasonably to infer that the third country officially sanctions the alien's indefinite presence." *Id.* Indirect evidence may include factors such as "the length of an alien's stay in a third country, the alien's intent to remain in the country, and the extent of the social and economic ties developed by the alien." *Id.* at 974 (internal quotation marks omitted). "[T]he burden [then] shifts to the applicant to show that the nature of his stay and ties was too tenuous . . . for him to be firmly resettled." *Id.* at 976-77.

[6] It was the government's burden, not Mengtsu's, to offer proof of permanent residence, or, in its absence, to make an offer of proof that such evidence was unobtainable. Mengtsu specifically testified that she had never received an offer of citizenship or permanent residence in the Sudan. The government did not meet this burden, and thus the rebuttable presumption never arose in Mengtsu's case. Even if it had, the record compels a finding that Mengtsu rebutted the presumption of resettlement by showing that her stay was "tenuous." Her entry visa was issued by the Ethiopian government, not the Sudanese, and it was never stamped. Her two-year stay was in a refugee camp, and she testified that she "has nothing there." She and her husband have no employment, funds, or other social or economic ties to the Sudan. The IJ himself designated Ethiopia, rather than the Sudan, as the country of removal. Accordingly, the IJ's finding as to firm resettlement was not supported by substantial evidence.

### CONCLUSION

Because substantial evidence does not support the IJ's findings as to nexus and firm resettlement, we grant Mengtsu's petition for review and remand for further proceedings.

**GRANTED AND REMANDED**.