RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 11a0138p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

LILIA STSERBA; IGOR ANATOLIEVICH PABO;
ANTON STSERBA,

                          *Petitioners,*

      *v.*

ERIC H. HOLDER, JR., Attorney General,
                          *Respondent.*

No. 09-4312

On Petition for Review from the Board of Immigration Appeals.
Nos. A098 152 318; A098 152 319; A098 0152 320.

Decided and Filed: May 20, 2011

Before: MOORE and WHITE, Circuit Judges; VARLAN, District Judge.[*]

_____

### COUNSEL

**ON BRIEF:** Anna Markovich, LAW OFFICE OF ANNA MARKOVICH, LLC, Cleveland, Ohio, for Petitioners. Stefanie A. Svoren, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

_____

### OPINION

_____

KAREN NELSON MOORE, Circuit Judge. Lilia Stserba and her son, Anton, are Estonian citizens who are ethnically Russian. Stserba's husband, Igor Anatolievich Pabo, is a Russian citizen. All three petitioners came to the United States legally and sought asylum and withholding of removal. They alleged past persecution on account of their Russian ethnicity and fear of future persecution. The alleged persecution centers

---

[*]The Honorable Thomas A. Varlan, United States District Judge for the Eastern District of Tennessee, sitting by designation.

around four issues: (1) revocation of Stserba's Estonian citizenship after Estonia regained independence from the USSR; (2) Estonia's invalidation of Russian medical degrees and attendant job limitations for Stserba; (3) delayed diagnosis of Anton's medical condition and inferior health care that he received on account of his ethnicity; and (4) and maltreatment of Stserba's older son, Artjom, who resides in Estonia.

The immigration judge ("IJ") found the petitioners credible but deemed their allegations insufficient to justify asylum or withholding of removal. The Board of Immigration Appeals ("BIA") affirmed. Stserba and the derivative petitioners[1] claim that insubstantial evidence supports the BIA's decision and that the BIA failed to consider Artjom's harassment. We conclude that the BIA did not consider whether revocation of citizenship on account of ethnicity is persecution, and that the BIA lacked substantial evidence to support its conclusion that Stserba's job limitations were neither persecution nor on account of ethnicity. We **GRANT** the petition for review and **VACATE** the BIA's order. We **REMAND** the case for the BIA to consider: (1) whether ethnically motivated citizenship revocation that results in statelessness is persecution, and whether Stserba was persecuted on this basis; (2) whether the petitioners are entitled to a discretionary grant of asylum given our conclusion that Stserba endured past persecution when Estonia refused to recognize her medical degree; and (3) whether the petitioners are entitled to withholding of removal.

## I. BACKGROUND

In 1991, Estonia regained independence from the Soviet Union. With anti-Soviet sentiments running high, Estonia denationalized residents unless they or their ancestors were Estonian citizens prior to 1940. Stserba and Artjom, both ethnic Russians born in Estonia, were denationalized and became stateless. They regained citizenship in 1993 "by complete chance" in exchange for Stserba's vote in an election. A.R. 316 (Stserba Aff. ¶ 8). Anton, who had been born in 1992, also became a citizen at that time.

---

[1] *See* 8 U.S.C. § 1158(b)(3) ("A spouse or child . . . of an alien who is granted asylum . . . may . . . be granted the same status as the alien if accompanying, or following to join, such alien."). We therefore focus our attention on Stserba's petition.

Tensions with Russia persisted and, in 1998, Estonia "unilaterally stop[ped] the Estonian–Russian agreement regarding the mutual acceptance of the equivalency of educational and scientific degrees documents."  R. 456 ("Russian Diplomas Are Not Valid In Estonia" article).  Stserba had earned a medical degree from Leningrad Pediatric School in St. Petersburg and had previously worked as a pediatrician at an Estonian hospital.  The new policy meant that, in Estonia, practicing "medicine was no longer a career option" for Stserba.  A.R. 317 (Stserba Aff. ¶ 15).  In 1998 or 1999, she obtained employment as a doctor at a private Russian-language school, where the Russian hiring official overlooked her officially invalid degree.  In 2003, she left that job to come to the United States.

Prompting Stserba's move was Anton's medical condition.  Anton has phenylketonuria ("PKU"), a genetic defect that prevents the patient from metabolizing the amino acid phenylalanine.  PKU can damage the brain and central nervous system.  Newborns in Estonia are tested for PKU.[2]  Either Anton was not tested or Stserba was not notified that Anton tested positive, which Stserba attributes to ethnic discrimination.  Due to the delay in diagnosis until Anton was eight months old, Anton suffered neurological damage.  Treatment for PKU involves dietary formulas that limit phenylalanine intake. After Anton's diagnosis, Stserba obtained formulas for Anton for no cost through a research group at the University of Tartu, although she discovered that program through her own legwork and without referrals from Anton's doctors.  When Anton was eight, the university began providing a different formula "[p]robably because this new formula was cheaper."  A.R. 129 (2/21/08 Hr'g Tr., Stserba).  For Anton, however, the formula was less effective.  His condition worsened and he displayed new autistic symptoms.  From then until Anton moved to the United States at age eleven, Stserba paid for his formula.  During this time, Anton was attending a school for mentally disabled students.  Stserba testified that Anton is mildly developmentally delayed but is not mentally disabled, although a letter from a doctor in the United States says that Anton has "mild mental retardation."  A.R. 478 (Dr. Swales Letter).  Stserba

---

[2]Anton's doctor in the United States disagrees, but the IJ credited Stserba's testimony on this point due to her personal experience as a pediatrician in Estonia.

believes that "only one reason" explains Anton's school placement in Estonia: his Russian ethnicity. A.R. 131 (2/21/08 Hr'g Tr., Stserba). All of the other 29 children in the PKU research group were ethnically Estonian and attended regular schools. Estonia does not have special-education programs that integrate special-needs children into standard schools. Anton's condition will require life-long treatment, but it has improved during his time in the United States, where he attends special-education classes at a public school.

Stserba and Anton entered the United States on July 28, 2003 as nonimmigrant visitors authorized to stay for eleven months. Pabo had entered the United States seven months earlier. They lived in Cleveland, Ohio. Stserba applied for asylum before her authorization expired, but her application was denied. Stserba, Pabo, and Anton were charged as removable under 8 U.S.C. § 1227(a)(1)(B) for overstaying their valid entry authorization. All three petitioners conceded removability but requested asylum and withholding of removal.[3]

At their hearing before the IJ, Stserba testified about her citizenship revocation and restoration, her employment troubles, and Anton's medical condition. She also testified about assorted acts of discrimination and harassment. For example, in 1993, an Estonian woman poured water on Stserba's head while Stserba was having her hair cut and said "you Russian [are] supposed to get out of here." A.R. 126–27 (2/21/08 Hr'g Tr., Stserba). In 1996, an Estonian sicced his dog on Artjom, causing an injury that required sixteen stitches, and rumor had it that the motivation was Artjom's Russian ethnicity. Stserba's apartment was burglarized in 1999. Artjom has faced more harassment since the rest of his family came to the United States: his car was set on fire, someone called him a "Russian Pig" while beating him and stabbing his hand with a knife, A.R. 560 (Egorova letter), and police struck him with a stick during the 2007 riots at the relocation of the Bronze Soldier of Tallinn, a Soviet-era statue of a Russian World War II soldier.

---

[3]Initially, the petitioners also sought voluntary departure and protection under the Convention Against Torture Treaty. They abandoned these forms of relief when their case was before the BIA.

Should they return to Estonia, Stserba fears that Anton's life will be in danger because she will not be able to buy the formula that Anton needs. Estonia, she says, provides health care to citizens, but not to those who are ethnically Russian. Stserba suspects that her employment opportunities in Estonia will be limited to babysitting and cleaning. Pabo fears that his family will be beaten or killed in Estonia. Pabo has also had trouble obtaining Estonian resident status and has been mistakenly detained by police.

Although the IJ found each petitioner's testimony to be credible, he determined that their testimony did not demonstrate past persecution. The IJ noted that Stserba regained citizenship quickly and did not suffer "any adverse consequences" from the years that she spent stateless. A.R. 69 (IJ Op.). As for Stserba's job prospects, the IJ found that voiding diplomas from Russian universities affected Estonian citizens of all ethnic backgrounds. The IJ also noted that Stserba can still obtain work as a babysitter or as a pediatrician at a private Russian school. Finally, the IJ agreed that Anton "is more likely to get the best medical treatment for his condition in the United States," and the State of Ohio has provided his dietary supplements free of charge, whereas the treatment was expensive in Estonia. *Id.* at 77. Nevertheless, Anton's past treatment evidences that treatment options exist in Estonia, and "the fact that a higher quality of medical care is available in the United States is not a basis for asylum." *Id.* The IJ also determined that mistake—not the family's persecution—could account for the hospital's failure to provide PKU test results at birth, and that the decision not to integrate developmentally delayed students into regular schools is also not a result of ethnic persecution. Therefore, the IJ ordered that Stserba and Anton be removed to Estonia and Pabo to Russia.

The BIA affirmed, adding that, although the IJ did not expressly mention the events involving Artjom, "they do not, either individually or cumulatively with the other

evidence of record, warrant a remand for further consideration." A.R. 4 (BIA Op.).**4** A panel of this court denied Stserba's motion to stay removal.

## II. DISCUSSION

### A. Standard of Review

We review de novo the BIA's resolution of "[q]uestions of law and constitutional questions." *Lin v. Holder*, 565 F.3d 971, 976 (6th Cir. 2009). At the same time, "[w]e generally accord *Chevron* deference to the BIA's decisions construing ambiguous statutory terms in the [Immigration and Nationality Act ("INA")], and we must uphold the BIA's construction unless it is 'arbitrary, capricious, or manifestly contrary to the statute.'" *Kellermann v. Holder*, 592 F.3d 700, 702 (6th Cir. 2010) (quoting *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843–44 (1984)).

When the BIA denies asylum or withholding of deportation, we review its findings of fact to determine whether substantial evidence supported the decision. *Daneshvar v. Ashcroft*, 355 F.3d 615, 624 (6th Cir. 2004). "We . . . may reverse only if the decision was 'manifestly contrary to law,' 8 U.S.C. § 1252(b)(4)(C), that is, if the evidence not only supports a contrary conclusion, but indeed *compels* it." *Haider v. Holder*, 595 F.3d 276, 281 (6th Cir. 2010) (internal quotation marks omitted). Because the IJ found all three petitioners credible, "we must accept the representations [that the petitioners] made in the application and their testimony as true." *Gilaj v. Gonzales*, 408 F.3d 275, 285–86 (6th Cir. 2005).

### B. Asylum

To obtain asylum, the petitioner must be a refugee, which means that the petitioner must be unwilling to return to his or her home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C.

---

**4**The BIA also concluded that Stserba did not establish that her family would be separated, and stated that, in any event, family separation would not provide a basis for asylum. Stserba has not raised that issue on appeal.

§ 1101(a)(42)(A).  Moreover, the petitioner "bears the burden of establishing" that his or her application "merits a favorable exercise of discretion by the Attorney General." *Cruz-Samayoa v. Holder*, 607 F.3d 1145, 1150 (6th Cir. 2010) (internal quotation marks omitted).

If the petitioner demonstrates past persecution, then we presume, subject to rebuttal, that he or she has a well-founded fear of future persecution.  8 C.F.R. § 208.13(b)(1).  "A well-founded fear must be both subjectively genuine and objectively reasonable."  *Daneshvar*, 355 F.3d at 623.  "[O]ne can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place."  *Id.* at 624 (internal quotation marks omitted).

Neither the INA nor the BIA has defined the term "persecution," *Japarkulova v. Holder*, 615 F.3d 696, 699 (6th Cir. 2010), and the term is ambiguous, *Mirzoyan v. Gonzales*, 457 F.3d 217, 220–21 (2d Cir. 2006); *Chen v. Ashcroft*, 381 F.3d 221, 222 (3d Cir. 2004) (Alito, J.); *Fisher v. INS*, 79 F.3d 955, 961 (9th Cir. 1996) (en banc).  It is well established, however, that physical harm is not an essential feature of persecution. *Haider*, 595 F.3d at 286.  Nonphysical persecution can take various forms, including "'the deliberate imposition of severe economic disadvantage or the deprivation of liberty, food, housing, employment[,] or other essentials of life.'" *In re T-Z-*, 24 I. & N. Dec. 163, 171 (B.I.A. 2007) (quoting H.R. Rep. No. 95-1452).  Persecution requires "more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty." *Ouda v. INS*, 324 F.3d 445, 452 (6th Cir. 2003) (internal quotation marks omitted). "Typically, . . . the types of actions that might cross the line from harassment to persecution include:  detention, arrest, interrogation, prosecution, imprisonment, illegal searches, confiscation of property, surveillance, beatings, or torture." *Haider*, 595 F.3d at 286–87 (internal quotation marks and alteration marks omitted).  Although persecution is an "extreme concept," persecution does not require "a total deprivation of livelihood or a total withdrawal of all economic opportunity." *In re T-Z-*, 24 I. & N. at 172–73.  "The IJ (and this court) must evaluate [evidence of] past persecution . . . in

the aggregate, as a collection of harmful events" because, "even though [the events] may not qualify individually as persecution," they may qualify as persecution when "taken together." *Haider*, 595 F.3d at 287 (internal quotation marks omitted).

Moreover, the "on account of" language in § 1101(a)(42)(A) requires a link between the acts of persecution and the petitioner's protected-group identity. Petitioners must have been "specifically targeted by the government for abuse based on a statutorily protected ground," not merely victimized "by indiscriminate mistreatment" or "random crime." *Gilaj*, 408 F.3d at 285. However, in a case of mixed motives, the petitioner "is eligible for asylum or the withholding of removal so long as *one* of th[e] factors [motivating the persecution] is a protected ground under the INA." *Al-Ghorbani v. Holder*, 585 F.3d 980, 997 (6th Cir. 2009) (emphasis added).

## 1. Revocation of Citizenship

Although not every revocation of citizenship is persecution, ethnically targeted denationalization of people who do not have dual citizenship may be persecution.

"The basic rule under international law is that it is within each state's domestic jurisdiction to decide who are its nationals." Richard C. Visek, *Creating the Ethnic Electorate through Legal Restorationism: Citizenship Rights in Estonia*, 38 Harv. Int'l L. J. 315, 346 (1997). In recognition of each state's sovereign right, denying citizenship to a noncitizen applicant is not necessarily persecution. There is, however, a "fundamental distinction between *denying* someone citizenship and *divesting* someone of citizenship." *Haile v. Holder* (*Haile I*), 421 F.3d 493, 496 (7th Cir. 2005); *see also United States v. Mandycz*, 447 F.3d 951, 956–57 (6th Cir.) (recognizing that, although "*naturalization* [is] a privilege to be given or withheld on such conditions as Congress sees fit," the government "faces a rigorous burden of proof" in *denaturalization* proceedings (emphasis added)), *cert. denied*, 549 U.S. 956 (2006). Even divestiture of citizenship is not persecution when, "as a result of altered boundaries, a person finds himself a citizen of a different country. For example, when Czechoslovakia divided into two countries, the Czech Republic and Slovakia, each former citizen of Czechoslovakia was told to choose between becoming a citizen of the Czech Republic or of Slovakia."

*Haile v. Holder* (*Haile II*), 591 F.3d 572, 573–74 (7th Cir. 2010) (Posner, J.). The "affected individuals" did not "become stateless; they simply became citizens of a new[ly created] state." *Id.* at 573. Because the choice that citizens of former Czechoslovakia faced was a necessary consequence of Czechoslovakia ceasing to exist, posing that choice did not persecute any group. *See* Timothy William Waters, *The Blessing of Departure:  Acceptable and Unacceptable State Support for Demographic Transformation:  The Lieberman Plan to Exchange Populated Territories in Cisjordan*, 2 Law & Ethics Hum. Rts. 9, 26 (2008) (asserting that "it is generally legitimate to redefine—revoke—citizenship when states change their frontiers.  The affected individuals cannot be left stateless, but so long as they are assigned to a new sovereign, then there is evidently no objection in principle" (footnote omitted)).

Practical consequences of denationalization vary.  Sometimes denationalized citizens face immediate turmoil, such as when Ethiopia "rounded up and expelled" ethnic Eritreans whom Ethiopia denationalized during a war with Eritrea, *Haile II*, 591 F.3d at 573, or when Nazi Germany enacted the Nuremberg Laws, which denationalized Jewish citizens as part of the Holocaust, *id.* at 574.  In contrast, ethnic Russians in the early 1990s could remain in Estonia and even become naturalized citizens of Estonia if they demonstrated "high level" knowledge of the Estonian language.  A.R. 400 (Aksel Kirch, *Russians in Contemporary Estonia – Different Strategies of the Integration in to the Nation-State,* (Oct. 15, 2000), *available at* www.ies.ee/15102000.htm) ("During the years 1992–2000[,] Estonian citizenship [was] given through naturalisation to about 125 thousand people and about one half (65 thousand) of them [were] Russians.").  The country also provided noncitizen residents with documents for "foreign travel, emigration, [and] repatriation."  A.R. 385 (Estonia:  Country Reports on Human Rights Practices – 2003).  During that same time, however, Estonia extended some rights and privileges only to citizens:  the rights to vote in nationwide elections and to join political parties, *id.* at 386,[5] protection for members of minority groups, *id.* at 388, and the right to purchase land, A.R. 372 (Open Society Institute Report, Minority Protection in

---

[5]In local elections, noncitizens may vote but not run for office.

Estonia (2001)).  *See also* Lowell W. Barrington, *The Making of Citizenship Policy in the Baltic States*, 13 Geo. Immigr. L. J. 159, 162 (1999) (documenting differences between the rights of Estonian citizens and noncitizens, including "protect[ion] from deportation and extradition," assurance of "the opportunity to resettle in the country" after leaving temporarily, and the ability to "hold[] national or local political office").

Regardless of the practical ramifications that befall a denationalized person, the inherent qualities of denationalization are troubling when a country denationalizes a person who is not a dual national, thereby making him or her stateless.  Statelessness is "a condition deplored in the international community of democracies." *Trop v. Dulles*, 356 U.S. 86, 102 (1958) (plurality op.); *see also Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 161 n.16 (1963) ("The drastic consequences of statelessness have led to reaffirmation in the United Nations Universal Declaration of Human Rights, Article 15, of the right of every individual to retain a nationality.").  The essence of denationalization is "the total destruction of the individual's status in organized society" because, "[i]n short, the expatriate has lost the right to have rights." *Trop*, 356 U.S. at 101–02.  "While any one country may accord [a denationalized person] some rights, . . . no country need do so because he is stateless." *Id.* at 101.  "The calamity is 'not the loss of specific rights, then, but the loss of a community willing and able to guarantee any rights whatsoever.'" *Mendoza-Martinez*, 372 U.S. at 161 (quoting Hannah Arendt, *The Origins of Totalitarianism* 294 (1951)) (internal alteration marks removed).  The United States Supreme Court has described denationalization as "a form of punishment more primitive than torture." *Trop*, 356 U.S. at 101.  Accordingly, because denationalization that results in statelessness is an extreme sanction, denationalization may be per se persecution when it occurs on account of a protected status such as ethnicity.  Although the status of "[s]tatelessness . . . does not entitle an applicant to asylum," *Maksimova v. Holder*, 361 F. App'x 690, 693 (6th Cir. 2010) (citing 8 U.S.C. 1101(a)(42)(A)), a person who is made stateless *due to his or her membership in a protected group* may have demonstrated persecution, even without proving that he or she has suffered collateral damage from the act of denationalization.  *Haile II*, 591 F.3d at 574 (remanding for the BIA to decide in the first instance whether denationalization that

leaves the applicant stateless is persecution); *Mengstu v. Holder*, 560 F.3d 1055, 1059 (9th Cir. 2009) (same).

Neither the IJ nor the BIA considered whether Estonia's citizenship law amounted to ethnically targeted denationalization, but there is reason to suspect that it did. By limiting citizenship to pre-1940 citizens and their descendants, Estonia manipulated its citizenship rules to exclude ethnic Russians who immigrated during the Soviet occupation. This limit even applied to residents such as Stserba who were born in Estonia. Although Estonia's policy of rolling back citizenship to 1940 did not mention ethnicity, the citizenship policy contained "an irreducible ethnic element" because it "base[d] citizenship for those who had become resident[s] during the Soviet era on language ability or knowledge of history—stratagems that effectively denationalized most Russians." Waters, *The Blessing of Departure*, *supra*, at 31; A.R. 348 (Open Society Institute Report) ("'[I]t was a desire to obtain or at least to approximate ethnic purity, . . . not consideration of legal consistency, that led to such an approach towards the citizenship question in Estonia.'" (quoting Rein Müllerson, former Deputy Foreign Minister of Estonia) (ellipses in original)); A.R. 332 (Pabo Letter) ("Basically, [the affected residents] were Russians and citizens of other republics of former USSR."); *cf. Mengstu*, 560 F.3d at 1059 (finding a nexus between a protected ground and Ethiopia's deportation and denationalization of Eritreans because Ethiopia targeted Eritreans during an "ethnically tinged" civil war).

Stserba was a victim of Estonia's policy. The IJ found that Stserba had "lost [Estonian] citizenship" after Estonia regained independence. A.R. 68 (IJ Op.); *see also* Reply Br. at 5 ("She was a citizen of Estonia when it was one of the Soviet Union republics."). In other words, Stserba did not switch citizenship due to the dissolution of her country of prior citizenship or as an incident of changed boundaries. Rather, she was an Estonian citizen[6] who was stripped of citizenship and became stateless[7] for several

_____

[6]Although the administrative record is thin on this point, the IJ's statement adopting Stserba's description of how citizenship functioned in the Estonian Soviet Socialist Republic ("SSR") seems to have some basis in fact. Estonian SSR residents "had been Soviet citizens" during the occupation, but "[t]he citizenship of the Republic of Estonia never ceased to exist." Citizenship - Estonia.eu, http://estonia.eu/about-estonia/society/citizenship.html (Feb. 2, 2011). "During the years of occupation,

years on account of her ethnicity. A.R. 119 (2/21/08 Hr'g Tr., Stserba) ("People like me, Russians, we didn't have any citizenship."). Even though the IJ did not believe that Stserba had shown "any adverse consequences which arose or which affected her as a consequence of her two year[s] or less of lost citizenship," A.R. 69 (IJ Op.), Stserba may have suffered past persecution simply because she became stateless due to her ethnicity.[8]

After a petitioner demonstrates past persecution, the government may rebut the presumption that the petitioner fears future persecution by showing a change in circumstance. The "fundamental change in circumstance" language in 8 C.F.R. § 208.13(b)(1)(i)(A) encompasses "a fundamental change in personal circumstances." 65 Fed. Reg. 76,121, 76,127 (Dec. 6, 2000). Reinstatement of her citizenship may be a change in Stserba's circumstances that rebuts the presumption that she fears future persecution. The IJ, however, did not consider changed circumstances as a basis for denying asylum because the IJ did not find that Stserba had endured past persecution. Although the IJ mentioned that "clearly, [Stserba] was able to regain her citizenship within a relatively short time," A.R. 69 (IJ Op.), the IJ was describing the limited ramifications of losing citizenship, not whether regaining citizenship rebutted a *presumption* that Stserba fears future persecution. In fact, the IJ described this case as "very sympathetic" and "a case in which the Court would prefer to be able to grant asylum." *Id.* at 77.

---

the Estonian diplomatic service in exile issued Estonian passports, which were recognised as travel documents by many countries of the world, eventually even by the Russian Federation." *Id.* In particular, the United States "refused *de jure* recognition of the Soviet annexation of the Baltic States." Visek, *Creating the Ethnic Electorate through Legal Restorationism*, *supra*, at 326 (describing actions that the United States took, including "fr[ee]z[ing] assets belonging to the Baltic States in order to protect such assets from Soviet seizure; allow[ing] the diplomatic representatives of the deposed Baltic governments to continue to represent the interests of their respective countries; and repeatedly denounc[ing] the Soviet annexation as illegal").

[7]To avoid being stateless, Stserba could have "register[ed]" herself as a Russian citizen, Citizenship - Estonia.eu, *supra* note 6, but she "was born in [Estonia]," "was living in Estonia," and did not "know where to go in Russia," A.R. 145 (2/21/08 Hr'g Tr., Stserba).

[8]Because Stserba did indeed become stateless upon her denationalization, we have no need to consider or determine at this time whether denationalization that does not result in statelessness can constitute persecution.

When the BIA has "failed to consider a legal issue central to resolution of the petitioner's claims, the appropriate remedy is remand to the agency for further consideration." *Mapouya v. Gonzales*, 487 F.3d 396, 405 (6th Cir. 2007) (internal quotation marks omitted). We therefore **REMAND** the case to the BIA to determine (1) whether ethnically motivated revocation of citizenship that leaves a petitioner stateless qualifies as "persecution" within the meaning of 8 U.S.C. § 1101(a)(42)(A). If the answer to that legal question is yes, then the BIA must determine, as a factual matter, (2) whether Estonia denationalized Stserba on account of her ethnicity, and if so, (3) whether reinstatement of Stserba's citizenship is a changed circumstance that rebuts the presumption that Stserba fears future persecution. On this last point, we note that "[n]othing in the regulation suggests that the future threats to life or freedom must come in the same *form* or be the same *act* as the past persecution." *Bah v. Mukasey*, 529 F.3d 99, 115 (2d Cir. 2008). The government cannot rebut the presumption that the petitioner fears future persecution "solely by showing that the particular act of persecution suffered by the victim in the past will not recur." *Id.* Thus, Stserba may have a well-founded fear of persecution due to Russian ethnicity that is premised partly on her prior loss of citizenship, even if she does not have a well-founded fear of again losing citizenship.

### 2. Stserba's Job Opportunities

The record compels the conclusion that invalidation of Stserba's medical degree was persecution on account of her ethnicity.

#### a. Persecution

"Economic deprivation constitutes persecution only when the resulting conditions are sufficiently severe." *Daneshvar*, 355 F.3d at 624 n.9; *see also In re J-H-S-*, 24 I. & N. Dec. 196, 200 (B.I.A. 2007) ("Enforcement efforts resulting in moderate economic impact would not, in general, prove a well-founded fear of future persecution."). Destitution or total deprivation of livelihood, however, is not required. "Government sanctions that reduce an applicant to an impoverished existence may amount to persecution even if the victim retains the ability to afford the bare essentials

of life." *In re T-Z-*, 24 I. & N. Dec. at 174. For example, "a sweeping limitation of opportunities to continue to work in an established profession or business may amount to persecution even though the applicant could otherwise survive," although it "is le[ss] likely to qualify as persecution *by itself*" than is a "particularly onerous fine" or "large-scale confiscation of property." *Id.* (emphasis added); *cf. In re Acosta*, 19 I. & N. Dec. 211, 234 (B.I.A. 1985) (requiring an unskilled taxi driver to change jobs or cooperate with guerrillas to avoid persecution because persecution was on account of his profession, not membership in a protected social group), *overruled on other grounds by INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987). Generally applicable laws can be the source of a petitioner's persecution. *Beskovic v. Gonzales*, 467 F.3d 223, 226–27 (2d Cir. 2006).

The IJ found that Stserba was not persecuted when her diploma was invalidated for two reasons, neither of which is supported by substantial evidence. First, the IJ stated that "the respondent testified that from the time of the birth of her son, Anton, until she got the job in the Russian school, she worked as a babysitter. That's precisely the employment that she holds in the United States today," and she likely could find similar employment in Estonia. A.R. 70 (I.J. Op.). Given the BIA's construction of economic persecution in *In re T-Z-*, the IJ's delineation of Stserba's field of employment is not supported by substantial evidence. Babysitting is not Stserba's established profession. After her maternity leave ended and Stserba attempted to resume employment as a doctor, she was forced to babysit and perform other housework because she "had to survive somehow." A.R. 317 (Stserba Aff. ¶ 15). The discrimination against ethnic Russians in the medical field culminated in the invalidation of Russian diplomas, which made it nearly impossible for Stserba to work as a pediatrician. Even if jobs in other fields are available, a petitioner has been persecuted if he or she has been subject to "sweeping limitations" on his or her chosen profession, particularly if that profession is a highly skilled one in which the person invested education or training.

The IJ's second reason also lacks support in the record. According to the IJ, Stserba, despite her invalid diploma, "was able to obtain employment as a doctor

eventually in a private Russian school," and "there is no evidence to suggest that she could not once again obtain employment as a physician at a Russian school in Estonia." A.R. 70, 76 (IJ Op.). Even if Stserba might find a private Russian school willing to employ her, Estonia still instituted a "sweeping limitation" of job opportunities that are otherwise available to pediatricians. Moreover, the IJ ignored the evidence in the record suggesting that Stserba may not find a job at a Russian school. Stserba testified that the school where she once worked has replaced her, A.R. 180, and that "state laws are changing and scruples [are] changing too," leaving fewer Russian schools and less independence for those that remain, *id.*; *see also* A.R. 362–63 (Open Society Institute Report) (describing laws "that may reduce the number of Russian language educational institutions in Estonia" and that will require 60% of instruction to occur in the Estonian language); A.R. 418 (Delfi Article) ("In Russian schools Estonians become Directors more often, while more Russian teachers without enough training teach the Estonian language.").

Substantial evidence does not support the IJ's conclusion that invalidation of Stserba's diploma was not persecution.

### b. On Account Of Ethnicity

The IJ determined that Estonia's policy was not based on ethnicity because the policy invalidated diplomas that anyone, regardless of ethnicity, earned at Russian schools. This conclusion fails to take into account that it seems inevitable that the policy disproportionately impacted ethnic Russians, who are more likely than other Estonians to have the language skills to attend and the interest in attending a Russian school. Critically, the IJ acknowledged that Estonia's policy of diploma invalidation probably was the result of "pent-up frustration resulting from years of Soviet rule." A.R. 69 (IJ Op.). That finding shows that the persecution was "motivated . . . , at least in part, on account of an enumerated ground." *Bi Xia Qu v. Holder*, 618 F.3d 602, 608 (6th Cir. 2010). Even if other motives—for example, an unlikely but conceivable determination that Russian schools are systemically inadequate—also could have motivated the policy, ethnicity was one motivating factor.

The only evidence about Estonia's policy for schools outside Estonia and Russia is that Stserba, when asked whether the policy "appl[ied] to all foreign diplomas," responded "Not at all. It's only for Russians received in Soviet Union." A.R. 129 (2/21/08 Hr'g Tr., Stserba). It is possible that Stserba was testifying about the particular policy that affected Russians; there may be other policies that invalidate diplomas from other countries. The evidence about Estonia's general practice is sparse, but its policy with regard to Russia is clear. The evidence compels the conclusion that Estonia invalidated Russian diplomas, at least in part, on account of ethnicity.

In sum, Stserba's job limitations amount to past persecution on account of ethnicity. Because we conclude that Stserba suffered past persecution, we **REMAND** to the BIA for further proceedings and to determine in the first instance "whether petitioners are entitled to a discretionary grant of asylum." *Gilaj*, 408 F.3d at 290; *see also Mapouya*, 487 F.3d at 411.

### 3. Medical Resources For Anton and Harassment of Artjom

On the other hand, the evidence does not compel the conclusion that Anton's difficulty in obtaining medical care was on account of his Russian ethnicity. While his PKU diagnosis might have been delayed due to the family's ethnicity, the IJ's explanation—that simple mistake may explain the failure to test Anton or to pass the results on to his mother—is also plausible. The same is true of his school placement. Anton benefits from his special-education program at a standard public school in the United States, but the fact that Estonia provides only standard schools and schools specializing in mental retardation is not evidence of persecution against ethnic Russians. Because the record does not reveal the mental abilities of any other children in the University of Tartu program, the evidence does not compel the conclusion that Anton's different treatment was on account of his ethnicity. Finally, although Anton may receive inferior medical care in Estonia, the evidence does not compel the conclusion that the lower-quality care will be on account of his ethnicity.

Stserba also argues that the BIA inadequately explained why Artjom's harassment, on its own or in combination with the other evidence, did not amount to persecution. While the BIA "should demonstrate that it has considered [the] evidence" that a petitioner presents, "the BIA is not required to parse or refute on the record every individual argument or document offered by the petitioner." *Guo Ping Wu v. Holder*, 339 F. App'x 596, 603 (6th Cir. 2009) (unpublished opinion). Here, the BIA concluded that, "[a]lthough these incidents were not specifically noted by the Immigration Judge, they do not, either individually or cumulatively with the other evidence of record, warrant a remand for further consideration." R. 4 (BIA Op.). That language, while terse, reflects consideration of the evidence of Artjom's harassment, and the record does not compel the opposite result. The incidents involving Artjom are disturbing but resemble random crime with weak links to ethnicity. An exception is the violent assault by an assailant who called Artjom a "Russian pig." However, the evidence does not suggest that the Estonian government perpetrated or acquiesced to the assault, and we are bound by circuit precedent holding that being "beaten" and "suffer[ing] some bodily injuries" from an isolated attack by civilians does not amount to persecution. *Lumaj v. Gonzales*, 462 F.3d 574, 577 (6th Cir. 2006). Therefore, the incidents involving Artjom were not persecution, and they do not compel the conclusion that Stserba has a well-founded fear of persecution.

With regard to medical resources for Anton and Artjom's harassment, we hold only that the BIA did not act contrary to law in concluding that these events, considered individually, are not persecution. However, on remand, the BIA must consider these issues "in the aggregate" along with citizenship revocation and diploma invalidation. *Haider*, 595 F.3d at 287 (explaining that "a collection of harmful events" may rise to the level of persecution when considered together).

## C.  Withholding of Removal

Withholding of removal requires the petitioners to demonstrate a "clear probability" of persecution. *Gilaj*, 408 F.3d at 289. The IJ relied on his finding that Stserba had not demonstrated persecution to conclude that she "has necessarily failed to

meet the higher standard of proof required to establish a claim for withholding of removal." R. 78 (IJ Op.). By relying on a finding that we have held to be erroneous, the IJ replicated his error when denying withholding of removal. *See Abay v. Ashcroft*, 368 F.3d 634, 643 (6th Cir. 2004) ("[B]ecause the standard for granting withholding of deportation is more stringent than the standard for granting asylum, and because the immigration judge denied the request as an *a fortiori* conclusion, we also remand the request for withholding of deportation for further consideration in light of our conclusions stated above."). On remand, the BIA should reconsider whether the petitioners qualify for withholding of removal in light of the issues discussed in this opinion.

## III. CONCLUSION

Revoking citizenship on account of ethnicity may be persecution, and the BIA should consider that question in the first instance. Moreover, sweeping limitations on Stserba's job opportunities as a doctor compel a finding that she was persecuted on account of her ethnicity. Therefore, we **GRANT** the petitioners' petition for review and **VACATE** the BIA's decision. We **REMAND** the case to the BIA to determine the following: (1) whether ethnically motivated citizenship revocation that results in statelessness is persecution and whether Stserba was persecuted on this basis; (2) whether the petitioners are entitled to a discretionary grant of asylum given our conclusion that Stserba endured past persecution when Estonia refused to recognize her medical degree; and (3) whether the petitioners are entitled to withholding of removal.