NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0669n.06

No. 09-4430

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

*Sep 14, 2011*

LEONARD GREEN, Clerk

FRANS SETIAWAN,                                      )
                                                     )
    **Petitioner,**                          )
                                                     )
                                                     )    **ON PETITION** FOR REVIEW
v.                                                   )    OF A DECISION OF THE
                                                     )    BOARD OF IMMIGRATION
ERIC H. HOLDER, JR., Attorney General,               )    APPEALS
                                                     )
    **Respondent.**                         )    OPINION

---

BEFORE: NORRIS, GIBBONS, and GRIFFIN, Circuit Judges.

    **ALAN E. NORRIS, Circuit Judge.** Petitioner Frans Setiawan, a citizen of Indonesia, seeks review of the denial of his application for asylum, withholding of removal, and protection under the United Nations Convention Against Torture ("CAT"). An immigration judge found petitioner "basically credible" but concluded that he had failed to meet his burden of showing that he had either suffered past persecution or had a well-founded fear of future persecution. The immigration judge also determined that petitioner had failed to establish that he would more likely than not be subject to torture if repatriated to Indonesia. The Board of Immigration Appeals ("the Board") agreed with that reasoning and dismissed the appeal. Petitioner contends that those decisions were not supported by substantial evidence.

I.

Petitioner filed two applications for asylum. The second, which is before us on appeal, includes a lengthy personal statement, the substance of which was reiterated during petitioner's hearing testimony. Because the immigration judge found petitioner's testimony credible in most respects, the following narrative is drawn from the personal statement and the hearing testimony.

Petitioner was born in Indonesia in 1972. He is the son of a retired army colonel and attended Trisakti University from which he graduated in 1996. He is also ethnically Javanese.

He bases his claims of past persecution on these incidents:

1. University Rioting

In 1998, petitioner lost his job due to a monetary crisis. The adverse economic conditions spawned protests against the regime of then-President Suharto. On May 13, 1998 a friend contacted petitioner and told him that there would be a protest march on the university campus. Petitioner attended the demonstration and made a brief speech in support of the protesters.

Thereafter, he joined a march to the parliament building. The police urged the demonstrators to return to the campus; they refused. A large explosion caused the demonstrators to disperse. Police then opened fire on them. Petitioner tried to flee and, as he was running away, a policeman hit him with a long stick. He eventually made his way home. According to his statement, "I had nasty bruises on my upper body, my arms, back and head." Newspapers the following day reported that five students had been killed.

2. Slipi Jaya Mall Firebombing

Two days later, petitioner went to a local mall to buy some clothes. Someone firebombed the mall while petitioner was shopping. Petitioner was not injured.

### 3. Neighborhood Attack

Petitioner's family lived in a military residential enclave in Jakarta. Not long after the university riot, one of petitioner's acquaintances received a threat from a stranger who said that mobs were massing to attack the neighborhood. The residents called the police and military for help to no avail. Petitioner grabbed a wooden club and his father a sword. Along with other residents the pair headed for the compound's entrance. The protesters arrived and, according to petitioner, "ran at us with their weapons, they thought they could scare us." The residents resisted, however, and the attackers ran away.

### 4. The Transmigration Department

In 1999, petitioner began working for the Transmigration and Forest Development Agency ("TFDA"). The governmental agency's mission was to relocate individuals from densely populated parts of the country to less densely settled areas. Most of those who volunteered to be relocated were poor and homeless individuals of the Madura ethnic group. According to petitioner, "[t]he transmigrants . . . were given some land, a house, some livestock and means to farm with a few years of supervised instruction, in areas inhabited by other uncooperative ethnic native groups."

When he applied, petitioner thought that his position would be clerical sinecure in Jakarta. Instead, he was told – after signing an employment contract – that he would be sent to Kalimantan Selatan (the Indonesian portion of Borneo). He was shocked by the assignment – he had no jungle skills or training that would prepare him for field work. However, he believed that he would be jailed if he broke his contract.

Much of Borneo is inhabited by the Dayak people who are traditional hunter gatherers, not farmers, and have a reputation for being fierce fighters. When he arrived in Borneo, he was assigned to work for a Transmigration Settlement Unit. As part of his duties, he and a co-worker were instructed to visit a settlement in Galam Rabah. The trip into the jungle was arduous. When they arrived, they discovered many of the houses unoccupied. These residences were essentially shelters built on stilts to keep out "orangutans, biawak huge Komodo-like lizards, and snakes."

Fortunately for petitioner, before he left for Borneo his father gave him a ring that he had received from a fellow soldier who happened to be a Dayak. After his arrival in Galam Rabah, petitioner encountered an older Dayak who took note of the ring and was sympathetic. The pair returned to the settlement where petitioner realized that his supervisor had fled out of fear of the Dayak. Worse yet, the co-worker who had accompanied petitioner to Galam Rabah had also left, leaving him stranded. He stayed overnight in the office. During the night Dayak men arrived and threatened to kill him. They all carried the mandau, a traditional curved sword. They charged the office and petitioner ran away. On the run he encountered the older Dayak whom he had met the previous afternoon. The elder calmed his countrymen by pointing to the Dayak ring.

Petitioner describes a dysfunctional settlement program. The Dayaks resented the introduction of a foreign ethnic group into their territory, as well as the taking of the jungle land for farming. They rejected the government's invitation to participate in the program.

After several miserable days in the settlement, which included finding an orangutan inside his office, petitioner made his way back to Banjarmasin, the regional capital where he was

permanently stationed. Other than the one threat by the Dayaks, which resulted in no injury to petitioner, he was unharmed.

After his return to Banjarmasin, petitioner received several assignments that involved travel to other settlements. At one point he was attacked at a bus stop by two Dayaks because he was wearing a TFDA uniform. He escaped though he suffered a cut hand that required "a couple stitch on my finger cause they tried to attack me with a knife." While these assignments had some hardships, they did not otherwise result in significant physical harm. Petitioner's personal statement dwells on the dysfunction of the program as a whole rather than his own "persecution." To highlight the state of the program, petitioner recounts that in February 2001 a "Dayak-Madura slaughter occurred in transmigration [settlements] neighboring my assigned area." He was not directly affected, however.

### 5. Manpower Ministry

In 2000, the Transmigration and Manpower (Labor) Ministries merged. Petitioner was transferred to the latter. He was assigned to the Training and Productivity Department. His job included checking out new businesses to assess their eligibility for a government permit to open. In the course of this job, he realized the program was riddled with corruption. When he reported this state of affairs to his superior, he was told that there was nothing to be done.

In September 2001, petitioner was working when protestors broke into the office looking for the departmental chief. When they failed to find him, they ransacked the offices. Petitioner hid under his desk and eventually escaped.

He finally resigned from the Manpower Ministry in February 2002. He returned to his father's home where he learned that "strangers" from Borneo had been to the house looking for him. He described his situation in these terms:

> When I came back to Jakarta, I knew I couldn't stay long for my safety. I felt like a prison guard in a political prison who quits. Those that I guarded hated me and tried to kill me because I tore them away from their old homes and sent them into exile in the wild jungles to survive in primitive conditions, the Madura. Those that I was trying to protect from [sic] hated me and tried to kill me because I brought outsiders who stole their land and brought them "Javanesation," the Dayak. And those that I worked for placed me without protection where I could get killed, the Java government, because I was a Trisakti graduate from an older military family.

(A.R. 222).

According to petitioner, even after he came to the United States, Dayaks continued to go to his father's neighborhood in search of him.

## II.

Petitioner entered the United States on a tourist visa on February 25, 2002. Thereafter, petitioner filed his first asylum application. On August 2, 2003, he was served with a Notice to Appear ("NTA"), which charged him with being a removable non-immigrant.

On December 23, 2003, petitioner appeared before an immigration judge and conceded removability. Another hearing was held on August 8, 2005. Petitioner had new counsel and informed the immigration judge that his original asylum application was untrue. It had been prepared by the Chinese Indonesian American Society, a group under criminal investigation for filing false asylum applications. According to counsel, petitioner had trusted these individuals and did not speak English at the time.

Petitioner was allowed to file a new asylum application. He did so on June 28, 2007. That application contains the allegations, later reiterated at the asylum hearing, recounted above.

The immigration judge rendered an oral decision on July 10, 2007. With respect to credibility, the immigration judge concluded: "Although the respondent did submit a false application under oath and did testify under oath falsely to the officer, it is the opinion of the Court that his testimony today in Court is basically credible." (A.R. 8). However, he included one caveat: "The only portions of his testimony that I would find to be not credible was his testimony that his parents, even after he came to the United States, received threats from Madura or Diac [sic] ethnic individuals, as he was also vague with respect to the threats that he stated he received after he arrived in Jakarta." *Id*.

Despite the favorable credibility determination, the immigration judge found that petitioner failed to establish past persecution or that he had a well-founded fear of future persecution. After recounting portions of the testimony, the immigration judge went on to state:

> Certainly the attacks by the Diacs [sic] and even by Maduras would not amount to persecution under the law. They were not part of the Indonesian government. And it is the opinion of the Court that although it was a very dangerous situation there, that there is no evidence presented that the Indonesian government would not have aided the respondent who was a member of an agency of that government.
>
> With respect to the other incidents, the May 13, 1998 incident where he was in a demonstration that was broken up by police, it is the opinion of the Court that that would not have amounted to persecution[:] he was hit with a stick on the back, there were no injuries to the respondent, and that would not have amounted to past persecution and there is no evidence of any fear from the Indonesian government, which is a new government at this time, because he participated with Trisakti protests that he would suffer any future persecution.

The incident in which the bomb exploded, which just amounted to a criminal act and general harm, and he was not targeted in that bomb attack, so that would not amount to persecution under the law.

Also, the respondent did not leave Indonesia until February 25, 2002. He received no harm from either Madurans or Diac [sic] indiviuduals prior to that time, and the phone calls would not have amounted to persecution, even if they did occur . . . .

With respect to the issue that the respondent could not resign from his job at the Transmigration Enforced Development Agency, it is the opinion of the Court that he has not met his burden of proof that he could not resign from that agency because when that agency did merge with the Labor Department and it became part of the Manpower Agency . . . he was able to resign from that agency. . . .

. . . .

With respect to relief under the provisions of Article 3, the United Nations Convention Against Torture, there has been no evidence presented that members of the Indonesian government would be seeking the respondent out to torture him if he is returned to Indonesia . . . .

(A.R. 11-13).

The Board dismissed petitioner's appeal in a two-page decision. It agreed that petitioner had failed to establish past persecution: "The alleged physical encounters and threats experienced by the petitioner do not rise to the level of past persecution and were not motivated by a protected ground." (A.R. 4). Nor, in the Board's view, does "[t]he record . . . contain sufficient evidence to show that the persons who mistreated the petitioner continue to have a present interest in harming him today for any reason." *Id.*

**III.**

1. Petitioner's Asylum Claim

Asylum is limited to those individuals who are refugees, which is defined by the INA as "any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, *membership in a particular social group*, or political opinion. . . ." 8 U.S.C. § 1101(a)(42)(A) (emphasis added). In this case, the immigration judge looked to a Board decision, *Matter of Fuentes*, 19 I. & N. Dec. 658 (1988), and concluded that petitioner's employment with the Transmigration and Forest Development Agency qualified as "membership in a particular social group" for purposes of establishing refugee status.[1]

As we have recently observed, "the 'on account of' language in § 1101(a)(42)(A) requires a link between the acts of persecution and the petitioner's protected-group identity." *Stserba v. Holder*, __ F.3d __, 2011 WL 1901546 at *5 (6th Cir. May 20, 2011). Petitioner must have been persecuted because of a statutorily protected ground – here, membership in a particular social group – and not merely have been the victim of "indiscriminate mistreatment" or a "random crime." *Id.* (quoting *Gilaj v. Gonzales*, 408 F.3d 275, 285 (6th Cir. 2005)). Where an alien can show past persecution, he is accorded a rebuttable presumption of a well-founded fear of future persecution. 8 C.F.R. § 208.13(b)(1). Moreover, the alien's testimony, if credible, may be sufficient to sustain the burden of proof. 8 C.F.R. § 208.13(a). Where, as here, the immigration judge deemed petitioner

---

[1] While we do not read *Matter of Fuentes* as broadly as did the immigration judge, we will assume that petitioner established his membership in a particular social group because we base our holding on his failure to show past persecution or a well-founded fear of future persecution.

to be largely credible, we must accept the representations made by the petitioner as true. *Stserba*,

2011 WL 1901546 at *4.

> We have established that physical harm is not required to establish past persecution:
>
> > It is well established . . . that physical harm is not an essential feature of persecution. [*Haider v. Holder*, 595 F.3d 276, 286 (6th Cir. 2010).] Nonphysical persecution can take various forms, including "'the deliberate imposition of severe economic disadvantage or the deprivation of liberty, food, housing, employment[,] or other essentials of life.'" *In re T–Z–*, 24 I. & N. Dec. 163, 171 (B.I.A. 2007) (quoting H.R.Rep. No. 95–1452). Persecution requires "more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty." *Ouda v. INS*, 324 F.3d 445, 452 (6th Cir. 2003) (internal quotation marks omitted). "Typically, . . . the types of actions that might cross the line from harassment to persecution include: detention, arrest, interrogation, prosecution, imprisonment, illegal searches, confiscation of property, surveillance, beatings, or torture." *Haider*, 595 F.3d at 286–87 (internal quotation marks and alteration marks omitted). Although persecution is an "extreme concept," persecution does not require "a total deprivation of livelihood or a total withdrawal of all economic opportunity." *In re T–Z–*, 24 I. & N. at 172–73. "The IJ (and this court) must evaluate [evidence of] past persecution . . . in the aggregate, as a collection of harmful events" because, "even though [the events] may not qualify individually as persecution," they may qualify as persecution when "taken together." *Haider*, 595 F.3d at 287 (internal quotation marks omitted).

*Stserba*, 2011 WL 1901546 at *4. However, even if we consider petitioner's hardships through this

less demanding lens, his effort to establish past persecution still comes up short of those hallmarks

of persecution listed in *Stserba*: he was never detained, arrested, interrogated, beaten, denied food,

housing, or employment. The instances petitioner relies upon to establish past persecution even in

the aggregate, are not compelling: he was hit by a stick at the student demonstration of 1998; he

was placed in danger during the course of his employment with TEDA; he was attacked by two

Dayak men at a bus stop; and, according to him, he had to live in "deplorable" conditions.

Simply put, even though we credit petitioner's testimony, he has failed to show that he either suffered past persecution or has a well-founded fear of future persecution.

2. Withholding of Removal

Because an applicant seeking withholding of removal faces a more stringent burden than an applicant for asylum, this claim fails. *See Liti v. Gonzales*, 411 F.3d 631, 640-41 (6th Cir. 2005).

3. Relief under the CAT

To establish relief, petitioner must establish that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). We have denied relief under the CAT to individuals who have suffered far greater indignities than petitioner. *See Haider*, 595 F.3d at 289 (ruling that police did not torture individual when they detained him several times, spit in his face, sexually assaulted him with a firearm, punched him in the head, and subjected him to invasive searches).

We agree with the conclusion of the immigration judge that petitioner has failed to come forward with any evidence that he would be subject to torture by members of the Indonesian government if he is repatriated.

**IV.**

For the reasons outlined above, the petition for review is **denied.**